GENERAL MANUFACTURING CORP., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5386–63.  Filed July 2, 1965.

---

*Herbert S. Alterman* and *Kenneth T. Statmore*, for the petitioner.
*Julius M. Jacobs*, for the respondent.

DAWSON, *Judge:* Respondent determined a deficiency of $43,939.04 in the income tax of petitioner for the taxable year ended October 31, 1957. The issues presented for decision are: (1) Whether petitioner, General Manufacturing Corp., and its parent, B. B. Rider Corp., filed a consolidated corporation income tax return for the taxable year ended October 31, 1957; (2) whether the notice of deficiency dated September 5, 1963, was timely issued or was barred by applicable limitation provisions of the Internal Revenue Code; (3) whether petitioner is entitled to a bad debt deduction in the amount of $754,763.76; and (4) whether petitioner is entitled to an interest deduction in the amount of $622,414.84 instead of the $71,622.63 allowed by respondent.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties. Their stipulation and the exhibits specified therein are incorporated in these findings.

General Manufacturing Corp. (hereafter called petitioner), was incorporated in October 1950 under the laws of the State of New Jersey, as a wholly owned subsidiary of B. B. Rider Corp. (hereafter called Rider). Petitioner's principal place of business is in Lodi, N.J. It filed its Federal corporation income tax returns on a fiscal year basis, ending on October 31 of each year, up to and including the fiscal year ended October 31, 1956, with the district director of internal revenue at Newark, N.J.

Rider was incorporated in 1929 under the laws of the State of New Jersey. It has always been engaged in the sale and service of commercial and household refrigeration equipment and, from its inception, has held a franchise from the Frigidaire Division of General Motors Corp., as its servicing and installation contractor. About 1938 or 1939 the Stratmore family obtained the entire interest in Rider.

Benjamin A. Stratmore is president of both petitioner and Rider. Other officers of both corporations are Murray Stratmore, Irwin Stratmore, and Helen Stratmore. These persons were also members of the board of directors of both corporations.

Rider was primarily a sales and service organization requiring comparatively little capital. Its service operations were conducted on

a cash-upon-completion basis. Its sales operations were conducted on a conditional sales contract basis which enabled Rider, whenever it needed cash for its operations, to factor the receivables, i.e., the conditional sales contracts.

Petitioner, a manufacturer of precision airplane parts as a subcontractor for major aircraft companies, carried on a unique machine-shop operation in its manufacture of silver bearings having very close tolerances. This required a large outlay of capital for the requisite machinery and equipment, for research and development, for materials and supplies, and for tooling and payrolls to carry the company through the long period between its receipt of orders, their ultimate completion and its receipt of payment therefor—a leadtime which took anywhere from 4 to 18 months.

Petitioner was organized by Rider with an initial investment of $50,000 and it immediately became necessary to borrow funds to supply the tremendous amount of capital which petitioner needed to begin operations and thereafter to continue to carry on those operations. As a newly organized corporation with an inadequate initial capital investment, petitioner had no credit standing. On the other hand, Rider had been in existence for over two decades, had a valuable franchise from the Frigidaire Division of General Motors Corp., and enjoyed a good reputation in the financial community. Rider, therefore, had to, and did, use its own credit to borrow the funds which petitioner needed, and advanced those funds for the petitioner's use.

As its operations increased, petitioner's working capital requirements became greater and Rider's borrowings became larger, with the result that Rider had to pay increased rates of interest until in later years they ran as high as 2 percent per month.

Benjamin A. Stratmore had the responsibility of obtaining the necessary funds for the operations of both petitioner and Rider, of which about 85 percent to 90 percent was used for petitioner's operations and about 10 percent to 15 percent was used by Rider for the purchase of sheet metal and some equipment. Although some lenders may have known or suspected that the funds they lent to Rider would be put to use in petitioner's operations, they wanted to deal only with Rider because petitioner was "an empty shell and Rider had a fairly good reputation." Rider would deposit the lender's checks, made out to its order, in its own bank account and would then advance the funds thus obtained to petitioner on open account.

Petitioner operated at a loss in 4 of the first 6 years of operation and began its seventh fiscal year (ended October 31, 1957) with an operating loss carryover of $6,277.97. In its fiscal year ended October 31, 1957, it had an operating profit of $103,636.50 before taking into account any operating loss carryover.

Beginning with the calendar year 1952, Rider operated at a loss in every year, producing a deficit as of the beginning of 1957 of $1,076,423.79.

Each company maintained its own separate records, books of account, and bank accounts. There was, however, considerable intermingling of the funds between Rider and petitioner. Funds were transferred from the bank account of one company to the bank account of the other, depending upon their respective immediate cash needs. From November 1956 through August 1957 many transfers took place, including the payment by one company, out of its own bank account, of the expenses and capital obligations of the other. Some of these transactions included the payment of principal and interest to unsecured loan creditors.

On or about January 16, 1958, petitioner applied for, and obtained, an extension of time to April 15, 1958, within which to file its corporation income tax return for the fiscal year ended October 31, 1957; and on or about April 1, 1958, petitioner applied for, and obtained, a further extension of time to July 15, 1958, within which to file its income tax return. On or about July 15, 1958, petitioner applied for still another extension of time to October 15, 1958, within which to file its income tax return but such application was denied.

For all taxable years prior to January 1, 1957, Rider filed separate Federal corporation income tax returns on a calendar year basis. At no time did Rider seek, or obtain, the approval of the Commissioner of Internal Revenue to change its accounting period from the calendar year basis it had previously used to a fiscal year period ended October 31, 1957, or a fiscal year period ended October 31, 1958.

For none of the calendar years 1950 to 1956, inclusive, did Rider file any consolidated return either on behalf of itself as parent and petitioner as subsidiary, or upon any other affiliation with any other company or companies.

On January 20, 1959, the district director of internal revenue at Newark, N.J., received a U.S. Corporation Income Tax Return, Form 1120, with schedules attached, bearing the designation at the top of page 1, "B. B. Rider Corp." and showing that it was for the taxable year ended October 31, 1957. The return was signed, at the bottom of page 1, by Benjamin A. Stratmore, president, with the corporate seal of B. B. Rider Corp. affixed thereto. The schedules attached to the return disclosed that it was filed by Rider as a consolidated return for the taxable year ended October 31, 1957, for the affiliated group consisting of itself, as the parent corporation, and petitioner, as the subsidiary corporation. This consolidated return was filed by Rider, notwithstanding the fact that each of the companies had operated on, and had previously filed their separate income tax returns on, dif-

ferent fiscal years and no permission had been requested, or received, by them to change the taxable year of either of them. Petitioner did not file a consent (Form 1122) to the making of a consolidated return.

The schedules attached to the 1957 consolidated return disclosed that for the 12-month period ended October 31, 1957, petitioner had taxable income in the amount of $97,358.51; that for the period January 1 to October 31, 1957, Rider had an operating loss in the amount of $1,901,301.95; and that the combined operations of the two companies produced an overall loss of $1,803,943.42. These schedules also showed in detail the separate gross income and deductions of both Rider and petitioner.

On April 15, 1959, the district director of internal revenue at Newark, N.J., received a U.S. Corporation Income Tax Return, Form 1120, with schedules attached, bearing the designation, at the top of page 1, "B. B. Rider Corp." and showing that it was for the taxable year beginning November 1, 1957, and ended October 31, 1958. The return was signed at the bottom of page 1, by Benjamin A. Stratmore, president, with the corporate seal of B. B. Rider Corp. affixed thereto. The schedules attached to the return disclosed that it was filed by Rider as a consolidated return for the taxable year ended October 31, 1958, for the affiliated group consisting of itself, as the parent corporation, and petitioner, as the subsidiary corporation.

The schedules attached to the 1958 consolidated return disclosed that for the taxable year ended October 31, 1958, both Rider and petitioner had operating losses in the amounts of $2,230,207.10 and $2,283.46, respectively, and that the combined operations of the two companies produced an overall loss of $2,232,490.56.

The 1957 and 1958 consolidated returns were later audited by an internal revenue agent and the subsequent administrative processes with respect thereto took place in the following chronological order:

1. December 2, 1960.—Revenue agent's report recommended that the 1957 consolidated return be held invalid, that a deficiency be assessed against petitioner based upon its separate income, and that a negligence penalty be imposed.

2. April 25, 1961.—Notice of the revenue agent's recommendation was sent to petitioner.

3. June 15, 1961.—An informal conference was held at which petitioner claimed, if a separate return liability were to be imposed, a bad debt deduction of $754,763.76 claimed to be due from Rider. The conferee thereupon sent the case to the field for further investigation on the bad debt question.

4. September 5, 1961.—After receiving the revenue agent's report thereon, the conferee disallowed the claimed bad debt deduction and sustained the revenue agent's other recommendations.

5. February 15, 1962.—A copy of the final report was sent to petitioner with a 30-day notice.

6. June 18, 1962.—Petitioner filed its protest and raised an additional issue, claiming additional interest deductions based upon an allocation of the interest paid or accrued by both Rider and petitioner, in accordance with their respective use of the borrowed funds.

7. October 16, 1962.—Revenue agent's report on the investigation requested by the appellate division with respect to the allocated interest deduction question raised by petitioner recommended disallowance of the claimed interest deduction.

8. September 5, 1963.—Statutory notice of deficiency was sent to petitioner containing the following determination:

TAXABLE YEAR ENDED OCTOBER 31, 1957

*Adjustments to Taxable Income*

| | |
|---|---:|
| Taxable income as disclosed by consolidated return of B. B. Rider Corporation | $97, 358. 53 |
| Nontaxable income and additional deductions | |
| (a) Net operating loss deduction | 2, 283. 46 |
| Corrected taxable income | 95, 075. 07 |

*Explanation of Adjustments*

(a) There is allowed as a deduction against the foregoing income, the amount of $2,283.46 representing the operating loss of General Manufacturing Corp., for the taxable year ended October 31, 1958, as reflected on the consolidated return of B. B. Rider Corp., for that year.

*Computation of Income Tax*

| | |
|---|---:|
| Taxable income | $95, 075. 07 |
| Income tax liability | 43, 939. 04 |
| Income tax assessed | none |
| Deficiency in income tax | 43, 939. 04 |

On or about August 30, 1957, petitioner instituted proceedings in the U.S. District Court for the District of New Jersey for an arrangement with its creditors under chapter 11 of the United States bankruptcy laws. This proceeding was docketed under docket No. B518–57. At the same time Rider instituted a similar proceeding in the U.S. District Court, which was docketed under docket No. B517–57. These proceedings were consolidated.

By order of the U.S. District Court, dated August 30, 1957, a receiver was appointed to continue petitioner's business. The date set for the first meeting of creditors was September 12, 1957.

At the time the chapter 11 proceedings were commenced, petitioner was indebted to the United States for Federal unemployment taxes for 1957, and for withholding and social security taxes for various quarters of 1955, 1956, and 1957; but there was no outstanding indebtedness of petitioner to the United States for Federal income taxes. Respondent filed proofs of claims in the chapter 11 proceedings for the unemployment, withholding, and social security taxes. No proof of claim was filed for any income taxes.

On or about September 5, 1957, orders were entered in the chapter 11 proceedings appointing Bederson, Siegel & Co., an independent firm of certified public accountants, to make an audit of the books and records of petitioner, and appointing S. D. Leidesdorf & Co., an independent firm of certified public accountants, to make an independent audit of the books and records of Rider. Their reports on their respective audits disclosed that the books and records of both companies were inadequately maintained. Among other things, there were insufficient supporting data with respect to the assets, liabilities, income, and expense; and improper postings. As a result of these conditions, the accountants could not trace the various intercompany transactions and the intermingled funds; or determine therefrom whether the books properly reflected the state of the financial affairs between the companies; or submit a certified statement of the accounts of the companies.

After the chapter 11 proceedings of both petitioner and Rider were consolidated, and upon their application, an order confirming the amended plan of arrangement was entered in the U.S. District Court on December 10, 1958.

The plan of arrangement provided, among other things, that the debtors, Rider and petitioner, deposit $148,500; the tax claims of the United States aggregating $232,961.05 (petitioner—$143,566.93; Rider—$89,394.12) be allowed in full with statutory interest on all unpaid balances from the date of confirmation of the plan; $60,000 of the amount deposited, be paid to the director of internal revenue at Newark, N.J., immediately upon confirmation of the plan; the balance be paid in installments of $7,500 per month until all taxes due the United States, plus interest, are paid in full; all Federal taxes of whatever nature incurred during the pendency of the chapter 11 proceedings be paid in full in cash on date of confirmation of the plan of arrangement or immediately upon the due dates as required by law, if such due dates shall follow subsequent to the date of confirmation; all statutes of limitation on the collection of Federal taxes, plus statutory interest thereon, for the years and periods involved in the chapter 11 proceedings be suspended during the pendency of said proceedings and as long as any of the aforementioned

Federal taxes, plus statutory interest thereon, remain unpaid; and any additional outstanding Federal taxes, not covered by the proofs of claim already filed, determined to be due from the debtors to be allowed and paid by continuing the installment payments so long as may be necessary.

During the various conferences, investigations, and audits by the Internal Revenue Service, petitioner was requested to furnish the supporting data with respect to the various entries in its books of account and in its general ledger accounts, particularly with respect to the voluminous intercompany transactions and the transfer and intermingling of their funds. Some of the requested data was supplied, but not all of it.

Petitioner claims a bad debt deduction of $754,763.76 because of the alleged worthlessness of a debt in such amount due from Rider. Petitioner also claims an interest deduction of $622,414.84 instead of $71,622.63 allowed by respondent.

Petitioner is not entitled to file a consolidated return with Rider for its taxable year ended October 31, 1957.

Petitioner did not file a separate corporation income tax return for its taxable year ended October 31, 1957, unless the "consolidated" return of Rider is treated as the separate return of petitioner. The "consolidated" return was filed in good faith and disclosed the items of income and deductions of both Rider and petitioner which were used by respondent in determining the deficiency set forth in his notice of September 5, 1963.

OPINION

## Issue 1. Consolidated Return

Petitioner first contends that the respondent should have accepted the corporation income tax return for the taxable year ended October 31, 1957, filed as a consolidated return of Rider and petitioner since it fairly reflects the exact nature of transactions between the two companies. Respondent, on the other hand, argues that the petitioner is not entitled to the *privilege* of having the income tax liability for its fiscal year ended October 31, 1957, determined on a consolidated basis with its parent, Rider, because it did not comply with the necessary precondition of section 1501, I.R.C. 1954, requiring consent to the consolidated return regulations prescribed by section 1502. Respondent advances two additional reasons to support his position, namely, (1) that the return filed by Rider did not comply with consolidated return regulations because it was not made on the calendar year basis which Rider had used for prior years, and (2) that Rider did not obtain the approval of the Commissioner, as required by

section 442, to change its accounting period from a calendar year basis to the fiscal year ended October 31, 1957.

Section 1501 grants taxpayers the *privilege* of filing consolidated returns upon the condition that all members of the affiliated group consent to all the consolidated return regulations prescribed by section 1502 prior to the last day prescribed by law for filing such return. Section 1.1502–10(a), Income Tax Regs., provides that—

The privilege of making a consolidated return under section 1502 for any taxable year of an affiliated group must be exercised at the time of making the return of the common parent corporation for such year. For this purpose, the return is considered as made on the due date of such return (including any extensions of time granted by the Commissioner), regardless of the actual previous date of filing. Under no circumstances can such privilege be exercised at any time thereafter.

Section 1.1502–12(b), Income Tax Regs., provides that—

Each subsidiary must prepare duplicate originals of Form 1122, consenting to the regulations under section 1502 and authorizing the common parent corporation to make a consolidated return on its behalf for the taxable year and authorizing the common parent (or, in the event of its failure, the Commissioner or the district director) to make a consolidated return on its behalf (as long as it remains a member of the affiliated group), for each year thereafter for which, under paragraph (a) of § 1.1502–11, the making of a consolidated return is required. One of such forms, as prepared by each subsidiary shall be attached to the consolidated return, as a part thereof; and the other shall be filed, at or before the time the consolidated return is filed, in the office of the district director for the internal revenue district prescribed for the filing of a separate return by such subsidiary. No such consent can be withdrawn or revoked at any time after the consolidated return is filed.

Here the last day for filing the consolidated return for the fiscal year ended October 31, 1957, was January 15, 1958. No extension of time to file that return, as provided in section 6081 of the Code, was either sought or obtained. Petitioner not only failed to file the requisite consent (Form 1122) by January 15, 1958, but it actually applied for, and obtained, two extensions of time to file its own separate return for that taxable year. On July 15, 1958, petitioner still sought, though unsuccessfully, to obtain another extension to file its separate return for that year. By that time the last day for petitioner to have filed the requisite consent to the consolidated return regulations had passed. Consequently, petitioner did not have the *privilege* of making a consolidated return since it failed to comply with the precondition of the statute and the regulations. See *Oklahoma Contracting Corporation*, 35 B.T.A. 232, 237 (1937).

Moreover, the return filed by Rider was contrary to the specific requirement of section 1.1502–14(a), Income Tax Regs., which provides that the taxable year of an affiliated group making a consolidated

return *must* be the same as the taxable year of the common parent corporation. For all years prior to 1957, the taxable year of Rider, the parent, had been a calendar year. At no time did it seek, or obtain, the approval of the Commissioner to change its accounting period from the calendar year previously used to the fiscal year ended October 31, 1957, used in the alleged consolidated return. Therefore, even if petitioner had crossed the threshold of the *privilege* of reporting its income on a consolidated basis, the failure of Rider to comply with this requirement of the regulation, disqualifies and deprives the affiliated group of that privilege. *Oklahoma Contracting Corporation, supra* at 238.

We sustain the respondent on this issue.

## *Issue 2. Statute of Limitations*

Alternatively, petitioner maintains that the notice of deficiency dated September 5, 1963, was issued untimely and, therefore, the assessment of a deficiency for the taxable year ended October 31, 1957, is barred by the provisions of section 6501(a).[1] Its reliance on this section is based on the premise that the return filed in the name of B. B. Rider Corp., even if invalid as a consolidated return, is nevertheless valid as a separate return of the petitioner for such taxable year. To the contrary, respondent contends that section 6501(c)(3)—not section 6501(a)—is applicable because the consolidated return did not constitute a valid separate return of petitioner. Consequently, he argues that the deficiency notice was timely issued since the tax may be assessed at any time.

We agree with petitioner. Although the return filed has been rejected as a consolidated return, it was, and should be, treated as the separate return of petitioner sufficient to start the running of the 3-year period for assessment. Such return was filed on January 20, 1959, and the notice of deficiency was not sent to petitioner until September 5, 1963—almost 4 years and 8 months later. Plainly, the deficiency notice was untimely issued, thus barring the assessment of any deficiency for the taxable year ended October 31, 1957.

---

[1] SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(a) GENERAL RULE.—Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.

\*  \*  \*  \*  \*  \*

(c) Exceptions.—

\*  \*  \*  \*  \*  \*

(3) No RETURN.—In the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time.

Respondent's argument, briefly stated, is this: The "consolidated" return was not petitioner's separate return because it was not *intended* to be, nor was it filed as, a separate return. It was made by Rider and signed by Rider's president with Rider's corporate seal attached thereto. In addition, petitioner failed to sign the return, as required by section 6062, thus making it a nullity for income tax purposes. Therefore, the deficiency may be assessed at any time under the provisions of section 6501(c)(3).

These points lack merit. Numerous cases decided by this and other courts hold that in order to start the running of the assessment period a return need not be perfectly accurate or complete, or even filed on the form prescribed, if it is filed in substantial compliance with the requirements for a return. *Zellerbach Paper Co.* v. *Helvering*, 293 U.S. 172 (1934); *Germantown Trust Co.* v. *Commissioner*, 309 U.S. 304 (1940); and *F. A. Hall Co., Inc.*, 3 B.T.A. 1172 (1926). Moreover, there are many cases holding that a consolidated return, filed in good faith and making a substantial disclosure of items of income, deductions, credits, and other necessary information to permit computation and assessment of tax for each member of the affiliated group, is the return of *each* constituent corporation of the consolidated group for statute of limitations purposes with respect to assessment See *Commissioner* v. *Stetson & Ellison Co.*, 43 F. 2d 553 (C.A. 3, 1930), affirming 11 B.T.A. 397 (1928); *National Tank & Export Co.*, 3 B.T.A. 1217 (1926); *Kellogg Commission Co.*, 6 B.T.A. 771 (1927); *Colmer-Green Lumber Co.*, 12 B.T.A. 256 (1928); *Converse Cooperage Co.*, 17 B.T.A. 1285 (1929); *Continental Oil Co.*, 23 B.T.A. 311 (1931); *Newport Co.*, 26 B.T.A. 1246 (1931); and *Harvey Coal Corporation*, 12 T.C. 596 (1949).[2] See also sec. 1.1502–18(a), Income Tax Regs.

Here, as in several of the cases cited above, the "consolidated" return contained schedules attached to it, one for Rider and one for the petitioner. The schedules disclose the gross income, deductions, and taxable income of both corporations in such a way that the items could be readily verified and the tax computed. Cf. *Commissioner* v. *Stetson & Ellison Co.*, *supra*, where the return was held to be sufficient to start the statute of limitations running even though the "income, invested capital, and deductions were not separated." Moreover, the respondent's revenue agent testified that the deficiency here asserted was actually computed from the information contained in the "consolidated" return and the attached schedules. *Harvey Coal Corporation*, *supra* at 605. Therefore, the return filed obviously contained the necessary data from which the tax could be computed and assessed. Respondent was aware of the essential facts as a result of the revenue agent's audit and subsequent administrative action; and the deficiency

---

[2] Although these cases are directly in point, none of them are cited or discussed in the briefs of either party.

notice could have been issued prior to January 20, 1962, viz, within the usual 3-year period from the date the return was filed. This was not done. We find no such "concealment or misrepresentation" in the return as will permit respondent to invoke the provisions of section 6501(c)(3) and thus bar the running of the 3-year statute of limitations. *Harvey Coal Corporation, supra; Commissioner* v. *Stetson & Ellison Co., supra;* and *Germantown Trust Co.* v. *Commissioner, supra.* The decision in *Commissioner* v. *Lane-Wells Co.*, 321 U.S. 219 (1943), is distinguishable since it involved two separate and distinct taxes, and not just income taxes. *Burford Oil Co.*, 4 T.C. 613 (1945), affd. 153 F. 2d 745 (C.A. 5, 1946), and *General Instrument Corporation*, 35 T.C. 803 (1961), are also distinguishable on their facts.

In view of the controlling decisions, we conclude that respondent sent an untimely notice of deficiency to petitioner and any assessment based thereon is barred by the provisions of section 6501(a).

Having made this determination, it becomes unnecessary for us to consider petitioner's further contention that the assessment of a deficiency against it for the taxable year in controversy is barred by the provisions of section 57(n) of the Bankruptcy Act (11 U.S.C. sec. 93(n)) and section 6871(a) of the Internal Revenue Code. Likewise, we need not consider the issues raised by petitioner relating to the claimed bad debt deduction and the interest deduction.

*Decision will be entered for the petitioner.*