150 T.C. No. 4

UNITED STATES TAX COURT

MELISSA COFFEY HULETT a.k.a. MELISSA COFFEY, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 30676-09, 31119-09,       Filed January 29, 2018.
4720-10,  4949-10.

Ps filed a petition for redetermination of income-tax deficiencies for 2003 and 2004, which arose from R's finding that Ps were not *bona fide* residents of the U.S. Virgin Islands and that Ps were nonfilers for federal tax purposes. Ps moved for summary judgment and claimed that they were *bona fide* Virgin Islands residents and that filing returns in the Virgin Islands satisfied their federal filing obligations. Ps argue that their subjective good faith belief of residency is sufficient to start the statute of limitations. Alternatively, Ps argue that R's receipt of part of Ps' Forms 1040 directly from the Virgin Islands constituted Ps' returns' being filed with R.

---

[1] Cases of the following petitioners are consolidated: Emily Coffey, docket No. 31119-09; Judith S. Coffey, Petitioner & The Government of the United States Virgin Islands, Intervenor, docket No. 4720-10; and James L. Coffey, docket No. 4949-10.

Held: The IRS's receipt of a return determines its filing.

Held, further, Ps' Forms 1040 were filed with the correct IRS service center.

Held, further, the first two pages of Ps' Forms 1040 and attached Forms W-2 filed with the Virgin Islands and received by the IRS contained sufficient information to calculate tax liability.

Held, further, Ps' Forms 1040 purported to be their tax returns.

Held, further, Ps' Forms 1040 showed on their face an honest and reasonable attempt to satisfy their tax obligations.

Held, further, Ps' Forms 1040 were properly executed under penalties of perjury.

Randall P. Andreozzi, Edward Doyle Fickess, Michael J. Tedesco, and Heather L. Marello, for petitioners.

Gene C. Schaerr, Alexander H. Pepper, and Geoffrey P. Eaton, for intervenor in docket No. 4720-10.

Michael W. Berwind, James G. Hartford, and Randal L. Eager, Jr., for respondent.

## OPINION

HOLMES, Judge:  Statute-of-limitations questions posed by taxpayers who filed returns with only the United States Virgins Islands (VI) are not new:  This is the fourth case in a sequence.  In Appleton v. Commissioner, 140 T.C. 273 (2013), we held that a *bona fide* resident of the Virgin Islands had to file a federal return, but that the return he filed with the Virgin Islands Bureau of Internal Revenue (VIBIR) was that return.  In Estate of Sanders v. Commissioner, 144 T.C. 63 (2015), vacated and remanded, 834 F.3d 1269 (11th Cir. 2016), we held that we apply normal standards of residency when deciding who is a *bona fide* VI resident. And in Cooper v. Commissioner, T.C. Memo. 2015-72, we held that a subjective good faith belief that one is a *bona fide* resident is not itself proof of *bona fide* residency.  Here our focus shifts yet again.  We will assume that the taxpayer who filed with the VIBIR is not a *bona fide* VI resident.  But the VIBIR sent what she filed--or at least a substantial part of what she filed--on to the IRS.

A nonresident of the VI with both U.S. and VI income has to file with both the VIBIR and the IRS to satisfy her obligation to file a return under the Internal Revenue Code.  But does the VIBIR's sharing of information with the IRS amount to the filing of a return?

Today we answer that question.

## Background

We are asked to consider the Coffeys' motions for summary judgment.[2]  We find no facts.  The background information comes from the documents that are in the record and facts that the Commissioner does not contest.

Judith and James Coffey have been married for over 35 years.  They had a successful joint career in scholastic publishing and in May 1985 incorporated Rainbow Educational Concepts, Inc., an S corporation.  Rainbow Concepts is a publisher's development company that focuses on the editorial design and production of school textbooks.  It has an impressive list of big-name clients, such as Houghton Mifflin, McGraw-Hill, and Scholastic.  Judith was the president of Rainbow Concepts until 2003, and James was and remains its vice president.  It is a profitable business.  They reported nearly $1.5 million of adjusted gross income on their 2003 joint income tax return and another $1.4 million on their 2004 return.  With high income usually comes high taxes--at least sometimes.

---

[2] We consolidated docket numbers 30676-09, 31119-09, 4720-10, and 4949-10 for trial, briefing, and opinion.  This opinion decides summary-judgment motions in two of these cases.  Only Judith Coffey in docket number 4720-10, and James Coffey in docket number 4949-10, moved for summary judgment.  When we refer to the "Coffeys", we refer only to them.

The Coffeys first became aware of some of the advantages of VI taxation in 2003. Chief among these is the VI's Economic Development Program (EDP). The EDP's purpose is to bring business to the VI, and to do so, it offers very lucrative tax incentives to some taxpayers who establish that they are *bona fide* VI residents. See sec. 932;[3] Huff v. Commissioner, 135 T.C. 222 (2010). This is not a secret--Congress specifically allows the VI to reduce taxes on "income derived from sources within the Virgin Islands or income effectively connected with the conduct of a trade or business within the Virgin Islands." Sec. 934(b)(1). The EDP provides substantial benefits to participating companies: a 90% exemption from local-income taxation, a 90% exemption from dividend taxation, and a 100% exemption from gross-receipts taxation. See Huff, 135 T.C. at 227.

It didn't take long for the IRS to notice these incentives and to identify their potential for abuse. It made adventurous taxpayers aware of its skepticism of the EDP by issuing Notice 2004-45, 2004-2 C.B. 33. In this notice the IRS described what it believed to be a typical scenario where U.S. taxpayers improperly claim to be *bona fide* VI residents to take advantage of the EDP when in reality their

---

[3] All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The subject of these cases requires citation of other titles of the United States Code, and we give the full citation for those.

situation hadn't changed one bit. An example given in the notice was of an employee of a company in the U.S. who terminated his employment only to become a partner in a VI partnership that provided the same services for the company that the employee used to perform--same job, but dressed up in consultant's clothes.

The Coffeys spoke with some tax professionals and decided to take advantage of the EDP in 2003. Judith ended her relationship with REC and became a partner in a VI partnership, IFW St. Croix Group, LLLP, later becoming StoneTree Group, LLLP (StoneTree). The Coffeys started looking for some property in October of that year, and closed on a house in St. Croix in December. They continued to own the house through at least 2010.

The Coffeys bought two cars, Judith got a VI driver's license, and she became a VI registered voter (and voted in its elections). Judith argues that she was a *bona fide* VI resident starting in 2003 through at least 2006. To that end, she believed that her filing obligations rested with the VIBIR and not the IRS. While not claiming to be a VI resident himself, James argues that he fell within the language of section 932(d). This section says that if two taxpayers file a joint return and the spouse who earns the higher adjusted gross income for the year is a VI resident, the spouse who isn't will be treated as one. Id.

With her VI contacts and section 932(d) in hand, the Coffeys filled out Forms 1040, U.S. Individual Income Tax Return, for each tax year from 2003 through 2007. As we explain in greater detail below, both VI residents and VI nonresidents fill out the same Form 1040 familiar to all Americans. On it they report their income and deductions and compute their tax. That much is simple. What has made these cases so complicated are questions of *allocation* and of *filing*. VI nonresidents who have income from inside the VI must include with their Forms 1040 a Form 8689, Allocation of Individual Income Tax to the U.S. Virgin Islands, on which they figure out what percentage of the total tax imposed by the Code they owe to the VIBIR and what percentage they owe to the IRS. Where to file is even more complicated, as some VI residents have to file only with the VIBIR, some VI residents and some VI nonresidents have to file with both the VIBIR and the IRS, and some VI nonresidents have to file only with the IRS.

For the two years at issue on these motions, Judith's income came from StoneTree. StoneTree performed services for Rainbow Concepts (and only Rainbow Concepts because of a noncompete agreement) that ranged from research and development, to management and consulting. Rainbow Concepts paid Stonetree the following fees in 2003 and 2004:

| Year | Project management | Sales commissions | Consulting |
|------|-------------------|-------------------|-----------|
| 2003 | $545,693 | $181,898 | $447,500 |
| 2004 | 1,008,292 | 336,097 | 275,000 |

REC also paid StoneTree $600,000 in 2003 as consideration for its agreement not to compete.

The amounts REC paid to StoneTree did not go directly or entirely to Judith--StoneTree had other partners and local employees. Judith received a Schedule K-1 from StoneTree that reported her income as a partner for each year. As the Coffeys took the position that Judith was earning this income in the VI, they claimed an EDP credit for 2003 and 2004. For 2003 their Form 1040 showed a precredit tax due of more than $450,000, but after the EDP credit a total tax liability of less than $100,000.[4] The power of the EDP was even greater for their tax year 2004, when their credit lowered their tax bill from nearly $500,000 to less than $50,000.

The Coffeys' Forms 1040 were complete and accepted by the VIBIR. Judith and James, as well as their tax-return preparer, each signed the returns. Their returns were complex. Their 2003 return consisted of the two pages of Form 1040, Schedules A, B, D, and E, as well as Form 6251, Alternative Minimum Tax

---

[4] They attached an EDP credit-calculation schedule to their returns.

for Individuals, Form 4562, Depreciation and Amortization, and Form 8801, Credit for Prior Year Minimum Tax. Their 2004 return consisted of the first two pages and Schedules A, B, and E, as well as Form 4797, Sales of Business Property, Form 6251, and Form 8801. There were also some miscellaneous papers attached that explained some calculations, as well as any W-2s they had. The VIBIR stamped the 2003 return "received" on October 15, 2004, and stamped the 2004 return "received" on October 24, 2005.

On each of their 2003 through 2006 tax returns, the Coffeys listed their St. Croix address. They sent their returns to the proper address for permanent residents of the VI: the V.I. Bureau of Internal Revenue in Charlotte Amalie on St. Thomas. The instructions on these returns, along with IRS Publication 570, said that *bona fide* VI residents need file only with the VIBIR and not the IRS. The VIBIR received and processed their returns.[5]

Although the Coffeys didn't send anything directly to the IRS, the VIBIR and the IRS share tax information pursuant to the Tax Implementation Agreement (TIA), U.S.-V.I. (Feb. 24, 1987), 1989-1 C.B. 347. Pursuant to the TIA, the United States and the VI will share information to administer and enforce their

---

[5] Although they sent returns to the VI in 2005 and 2006, they didn't claim EDP credits for those years; and the IRS never proposed any adjustments for them.

respective tax laws.  <u>Id.</u> art. 4(1), 1989-1 C.B. at 348.  Also, the VI will supply the United States with "copies of reports of individual * * * audit changes that disclose information relevant to the United States."  <u>Id.</u> art. 4(2)(b), 1989-1 C.B. at 348-49.  The TIA provides that the VIBIR will allow the IRS to examine VI tax returns.  <u>Id.</u> app. A, sec. 3.1, 1989-1 C.B. at 352.

Section 7654(a) requires taxes collected by the IRS to "be covered into the Treasury" of the VI when collected from *bona fide* VI residents.  When the VIBIR receives a return from a *bona fide* VI resident who had taxes withheld and remitted to the U.S. Treasury, the VIBIR will send a copy of the return (or parts of the return) to the IRS to ensure that those funds get sent to the VI.  This process is known as "covering over."  Before 2007, the VIBIR would send the information to the IRS's Philadelphia service center.  <u>See</u> Internal Revenue Manual (IRM) pt. 21.8.1.6.4 (Oct. 1, 2010).  In this case, the VIBIR electronically sent photocopies of the first two pages of the Coffeys' Forms 1040 for the years at issue, along with their W-2s (both U.S. W-2s and VI W-2s).  It's not clear from the record if this was customary (as opposed to sending the entire return, including the schedules), but we know it's not the first time the VIBIR has done this.  <u>See</u> <u>Estate of Sanders</u>, 144 T.C. at 69 (noting that the VIBIR only forwarded the first two pages of the 2002 Form 1040 to the IRS); <u>but see</u> <u>Appleton</u>, 140 T.C. at 275 n.3 (noting that

the VIBIR forwarded the complete 2002-04 returns, including schedules, to the IRS).

The IRS service center in Philadelphia received the transmission of the Coffeys' 2003 and 2004 returns and stamped them with document locator numbers.[6] It also stamped the 2003 return with a "postmark date" of February 5, 2005, and a "received" date of February 8, 2005, but for an unknown reason waited until March 14, 2005, to enter the return as "received" in its records. It entered the 2004 return in its records as received on March 27, 2006.[7] These markings on the returns are important, and we reproduce the image of the 2003 Form 1040 here:

---

[6] The IRS applies document locator numbers to documents for administrative, recordkeeping, and tracking purposes. It also makes retrieving the documents easier. See, e.g., McCall v. Commissioner, T.C. Memo. 2009-75; Ibeagwa v. IRS, 2015 WL 3791538, at *2 (W.D. Wis. 2015).

[7] The 2004 Form 1040 didn't have stamps on it like the ones the 2003 Form 1040 had.

MAR-13-2009  10:28       IRS                    6263125088      P.06

## U.S. Claim

Department of the Treasury — Internal Revenue Service

**U.S. Individual Income Tax Return** **2003**   (99)  IRS Use Only — Do not write or staple in this space.

6622104300018

OMB No. 1545-0074

For the year Jan 1 – Dec 31, 2003, or other tax year beginning _____, _____, .. to _____

| Your first name | MI | Last name | | Your social security number |
|---|---|---|---|---|
| JAMES L COFFEY | | TRANS. No. 05-11 | | |
| If a joint return, spouse's first name | MI | Last name | RT # _____ RV # 1224 | Spouse's social security number |
| JUDITH S COFFEY | | | | |

Home address (number and street). If you have a P.O. box, see instructions.   Apartment no.

5000 CARDEN BEACH #522

City, town or post office. If you have a foreign address, see instructions.   State  ZIP code

CHRISTIANSTED, ST. CROIX, USVI 00820 (USVI)

▲ **Important!** ▲
You must enter your social security number(s) above.

**Presidential Election Campaign** (See instructions.) ► Note: Checking 'Yes' will not change your tax or reduce your refund. Do you, or your spouse if filing a joint return, want $3 to go to this fund? ...... ► You [ ] Yes [X] No  Spouse [ ] Yes [X] No

**Filing Status**

Check only one box.

1 [ ] Single
2 [X] Married filing jointly (even if only one had income)
3 [ ] Married filing separately. Enter spouse's SSN above & full name here. ►
4 [ ] Head of household (with qualifying person). (See instructions.) If the qualifying person is a child but not your dependent, enter this child's name here. ►
5 [ ] Qualifying widow(er) with dependent child. (See instructions.)

**Exemptions**

6a [X] Yourself. If your parent (or someone else) can claim you as a dependent on his or her tax return, do not check box 6a. ..................

b [X] Spouse ............................

c Dependents:

| (1) First name   Last name | (2) Dependent's social security number | (3) Dependent's relationship to you | (4) ✓ if qualifying child for child tax credit (see instrs) |
|---|---|---|---|
| | | | [ ] |
| | | | [ ] |
| | | | [ ] |
| | | | [ ] |

No. of boxes checked on 6a and 6b .... 2

No. of children on 6c who:
• lived with you .....
• did not live with you due to divorce or separation (see instrs) ...
Dependents on 6c not entered above ...

If more than five dependents, see instructions.

d Total number of exemptions claimed .................

Add numbers on lines above ► 2

**Income**

Attach Forms W-2 and W-2G here. Also attach Forms 1099-R if tax was withheld.

If you did not get a W-2, see instructions.

Enclose, but do not attach, any payment. Also, please use Form 1040-V.

7  Wages, salaries, tips, etc. Attach Form(s) W-2 .......................... 7  264,692.
8a Taxable interest. Attach Schedule B if required ........................ 8a  851.
b Tax-exempt interest. Do not include on line 8a ... 8b  500.
9a Ordinary dividends. Attach Schedule B if required .................... 9a  265.
b Qualified dividends (see instrs) ... 9b  72.
10 Taxable refunds, credits, or offsets of state and local income taxes (see instructions) ....... 10  9,788.
11 Alimony received ................................................... 11
12 Business income or (loss). Attach Schedule C or C-EZ ................ 12
13a Capital gain or (loss). Att Sch D if reqd. If not reqd, ck here ► [ ] 13a  4.
b If box on line 13a is checked, see instructions ... 13b
14 Other gains or (losses). Attach Form 4797 ........................... 14
15a IRA distributions ........... 15a  b Taxable amount (see instrs).. 15b
16a Pensions and annuities .... 16a  b Taxable amount (see instrs).. 16b
17 Rental real estate, royalties, partnerships, S corporations, trusts, etc. Attach Schedule E .... 17  1,184,117.
18 Farm income or (loss). Attach Schedule F ............................ 18
19 Unemployment compensation .......................................... 19
20a Social security benefits ... 20a  b Taxable amount (see instrs).. 20b
21 Other income _____ 21
22 Add the amounts in the far right column for lines 7 through 21. This is your total income ...... ► 22  1,459,697.

**Adjusted Gross Income**

23 Educator expenses (see instructions) ................. 23
24 IRA deduction (see instructions) .................... 24
25 Student loan interest deduction (see instructions) ........ 25
26 Tuition and fees deduction (see instructions) ............ 26
27 Moving expenses. Attach Form 3903 ................. 27
28 One-half of self-employment tax. Attach Schedule SE ..... 28
29 Self-employed health insurance deduction (see instrs) ..... 29
30 Self-employed SEP, SIMPLE, and qualified plans ......... 30
31 Penalty on early withdrawal of savings ................. 31
32a Alimony paid b Recipient's SSN ► _____ 32a
33 Add lines 23 through 32a .......................... 33  0.
34 Subtract line 33 from line 22. This is your adjusted gross income ......... ► 34  1,459,697.

BAA For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see instructions.   FDIA0112L  01/16/04   Form 1040 (2003)

POSTMARK 02 05 '05

IRS-PHILA

02 08 2005

IRS-PHILA., PA 269

RECEIVED WITH REMITTANCE COLLECTION & DEPOSIT SECTION – Pha. 2

VIRGIN ISLANDS BUREAU OF INTERNAL REVENUE ST. THOMAS VI  OCT 15 2004

JAMES L AND JUDITH S COFFEY                                    Page 2

| | | | | |
|---|---|---|---|---|
| 35 | Amount from line 34 (adjusted gross income) | | 35 | 1,459,697. |
| 36a Check if: | ☐ You were born before January 2, 1939, ☐ Blind. **Total boxes** ☐ Spouse was born before January 2, 1939, ☐ Blind. **checked ▶ 36a** | | | |
| b | If you are married filing separately and your spouse itemizes deductions, or you were a dual-status alien, see instructions and check here...... ▶ 36b ☐ | | | |
| 37 | Itemized deductions (from Schedule A) or your standard deduction (see left margin)...... | | 37 | 57,960. |
| 38 | Subtract line 37 from line 35...... | | 38 | 1,401,737. |
| 39 | If line 35 is $104,625 or less, multiply $3,050 by the total number of exemptions claimed on line 6d. If line 35 is over $104,625, see the worksheet in the instructions...... | | 39 | 0. |
| 40 | Taxable income. Subtract line 39 from line 38. If line 39 is more than line 38, enter -0-...... | | 40 | 1,401,737. |
| 41 | Tax (see instrs) Check if any tax is from a ☐ Form(s) 8814 b ☐ Form 1972...... | | 41 | 465,799. |
| 42 | Alternative minimum tax (see instructions). Attach Form 6251...... | | 42 | |
| 43 | Add lines 41 and 42...... ▶ | | 43 | 465,799. |
| 44 | Foreign tax credit. Attach Form 1116 if required...... | 44 | | |
| 45 | Credit for child and dependent care expenses. Attach Form 2441... | 45 | | |
| 46 | Credit for the elderly or the disabled. Attach Schedule R.... | 46 | | |
| 47 | Education credits. Attach Form 8863...... | 47 | | |
| 48 | Retirement savings contributions credit. Attach Form 8880.. | 48 | | |
| 49 | Child tax credit (see instructions)...... | 49 | | |
| 50 | Adoption credit. Attach Form 8839...... | 50 | | |
| 51 | Credits from: a ☐ Form 8396 b ☐ Form 8859...... | 51 | | |
| 52 | Other credits. Check applicable box(es): a ☐ Form 3800 b ☐ Form 8801 c ☒ Specify _EDC CREDIT_ | 52 | 322,081. | |
| 53 | Add lines 44 through 52. These are your total credits...... | | 53 | 322,081. |
| 54 | Subtract line 53 from line 43. If line 53 is more than line 43, enter -0-...... ▶ | | 54 | 143,718. |

**Other Taxes**

| | | | | |
|---|---|---|---|---|
| 55 | Self-employment tax. Attach Schedule SE...... | | 55 | |
| 56 | Social security and Medicare tax on tip income not reported to employer. Attach Form 4137...... | | 56 | |
| 57 | Tax on qualified plans, including IRAs, and other tax-favored accounts. Attach Form 5329 if required...... | | 57 | |
| 58 | Advance earned income credit payments from Form(s) W-2...... | | 58 | |
| 59 | Household employment taxes. Attach Schedule H...... | | 59 | |
| 60 | Add lines 54-59. This is your total tax...... ▶ | | 60 | 143,718. |

**Payments**

If you have a qualifying child, attach Schedule EIC.

| | | | | |
|---|---|---|---|---|
| 61 | Federal income tax withheld from Forms W-2 and 1099...... | 61 | 49,309. | |
| 62 | 2003 estimated tax payments and amount applied from 2002 return... | 62 | | |
| 63 | Earned income credit (EIC)...... | 63 | | |
| 64 | Excess social security and tier 1 RRTA tax withheld (see instructions)..... | 64 | 1,302. | |
| 65 | Additional child tax credit. Attach Form 8812...... | 65 | | |
| 66 | Amount paid with request for extension to file (see instructions)...... | 66 | | |
| 67 | Other pmts from: a ☐ Form 2139 b ☐ Form 4136 c ☐ Form 8885 | 67 | | |
| 68 | Add lines 61 through 67. These are your total payments...... ▶ | | 68 | 50,611. |

**Refund**

Direct deposit? See instructions and fill in 70b, 70c, and 70d.

| | | | | |
|---|---|---|---|---|
| 69 | If line 68 is more than line 60, subtract line 60 from line 68. This is the amount you overpaid...... | | 69 | |
| 70a | Amount of line 69 you want refunded to you...... | | 70a | |
| ▶ b | Routing number...... ▶ c Type: ☐ Checking ☐ Savings | | | |
| ▶ d | Account number...... | | | |
| 71 | Amount of line 69 you want applied to your 2004 estimated tax...... ▶ | 71 | | |

**Amount You Owe**

| | | | | |
|---|---|---|---|---|
| 72 | Amount you owe. Subtract line 68 from line 60. For details on how to pay, see instructions...... ▶ | | 72 | 93,107. |
| 73 | Estimated tax penalty (see instructions)...... | 73 | | |

**Third Party Designee**

Do you want to allow another person to discuss this return with the IRS (see instructions)? ☒ **Yes.** Complete the following. ☐ No

Designee's name ▶ PREPARER    Phone no. ▶    Personal identification number (PIN) ▶

**Sign Here**

Joint return? See instructions. Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

Your signature _James J Coffey_  Date 10/12/04  Your occupation TEXTBOOK EDITING  Daytime phone number

Spouse's signature. If a joint return, both must sign. _Judith S Coffey_  Date 10-12-04  Spouse's occupation TEXTBOOK EDITING

**Paid Preparer's Use Only**

Preparer's signature ▶ JESSE W. STAFFORD, CPA  Date 10/10/04  Check if self-employed ☐  Preparer's SSN or PTIN

Firm's name (or yours if self-employed), address, and ZIP code ▶ STAFFORD & ASSOCIATES LTD CPAS  PO BOX 1514  JONESBORO, AR 72403-1514  EIN  Phone no. (870) 935-1091

SEE STATEMENT 1          97,781.                    Form 1040 (2003)

The IRS used these forms to create a "transcript of account" for each year.[8] The IRS's transcript of account for the Coffeys' 2003 tax year has a line that reads "return due date or return received date (whichever is later)." The date at the end of that line is "Oct. 15 2004", which is the date that the VIBIR stamped the Coffeys' 2003 return "received." The transcript also lists a "processing date" of March 14, 2005, the date the IRS says it received the Coffeys' tax forms in Philadelphia. The IRS's transcript of account for the Coffeys' 2004 return lists October 24, 2005--the date the VIBIR stamped as received the Coffeys' 2004 return--as the "return due date or return received date" and shows March 27, 2006 as the "processing date."

The IRS also seemingly extracted some information from these forms beyond simply processing them as cover-over documents. Its records reflect that the Coffeys were joint filers for 2003 and 2004 and that they claimed two exemptions. It showed withholding credits from non-VI sources, and also initially recorded their adjusted gross income as zero for both years.

---

[8] A transcript of account contains account information from the Commissioner's master files and shows various actions the IRS took with respect to a taxpayer in a given year. See Tornichio v. Commissioner, T.C. Memo. 2002-291, 84 T.C.M. (CCH) 578, 581-82 (2002).

These records are also important, and we reproduce the image of the

Coffeys' 2003 transcript of account here:

```
          --- ANY MINUS SIGN SHOWN BELOW SIGNIFIES A CREDIT AMOUNT ---

ACCOUNT BALANCE:        -47,124.00
ACCRUED INTEREST:       0.00          AS OF: Nov. 02, 2009
ACCRUED PENALTY:        0.00          AS OF: Nov. 02, 2009

ACCOUNT BALANCE
   PLUS ACCRUALS
   (this is not a
   payoff amount):     -47,124.00

              ** INFORMATION FROM THE RETURN OR AS ADJUSTED **

EXEMPTIONS:             02            FILING STATUS: Married Filing Joint
ADJUSTED GROSS
     INCOME:            0.00
TAXABLE INCOME:         0.00
    TAX PER RETURN:     0.00
SE TAXABLE INCOME
    TAXPAYER:           0.00
SE TAXABLE INCOME
    SPOUSE:             0.00
TOTAL SELF
   EMPLOYMENT TAX:      0.00

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER)  Oct. 15, 2004
PROCESSING DATE                                              Mar. 14, 2005
                               TRANSACTIONS
CODE EXPLANATION OF TRANSACTION           CYCLE     DATE            AMOUNT
150  Tax return filed - USVI return       20050908  03-14-2005       $0.00
     66221-043-00918-5

806  W-2 or 1099 withholding                        04-15-2004  -$47,124.00

460  Extension of time to file                      04-15-2004       $0.00
     ext. Date 08-15-2004

140  Inquiry for non-filing of tax                  02-23-2005       $0.00
     return

570  Additional account action pending             03-14-2005       $0.00

420  Examination of tax return                      08-04-2005       $0.00

960  Appointed representative                       10-03-2006       $0.00
          This Product Contains Sensitive Taxpayer Data
```

Time passed and the IRS eventually picked the Coffeys' returns for audit.

IRS records show that it selected the Coffeys' 2003 return in August 2005 and

their 2004 return in May 2006. But the Commissioner took his time and

concluded the exams by issuing them a notice of deficiency for both years only in

September 2009.  The deficiencies and penalties for Judith Coffey were:

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6654 |
| 2003 | $661,259.00 | $143,835.53 | $159,817.25 | - 0 - |
| 2004 | 521,416.00 | 117,318.60 | 130,354.00 | $14,942.27 |

And for James Coffey:

| | | Additions to Tax | | |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6651(a)(2) | Sec. 6654 |
| 2003 | $229,304.00 | $45,938.25 | $51,042.50 | - 0 - |
| 2004 | 139,905.00 | 30,408.53 | 33,787.25 | $3,857.81 |

The Coffeys timely filed petitions to contest the deficiencies.  They resided

in Arkansas at the time.  The VI intervened in the cases, and both it and the

Coffeys moved for summary judgment on the ground that the Commissioner had

blown the statute of limitations.  We at first denied the motion because we

believed that a material fact--whether the Coffeys were *bona fide* VI residents for

those years--was in dispute.  A little over a month later the Coffeys and the VI

both moved for reconsideration.  They believed that we had overlooked an

important legal issue in our order.

They argued that we erred because they believe that a subjective good faith belief that one is a *bona fide* resident is what matters for the statute of limitations.[9] The Coffeys also argued in their motion (and the VI adopted this position at oral argument) that even if they were supposed to file with both the VIBIR and the IRS, they met this obligation because the VIBIR's forwarding of information to the IRS in Philadelphia amounted to their filing returns there. These are serious arguments that we overlooked. We granted the motions to reconsider and now proceed to review the summary-judgment motions on their merits.

This means we must revisit those sound-easy-but-are-really-hard questions: What is a "return", and what does it mean to "file" it?

Discussion

I.      Section 932, VI Taxation, and How We Got Here

The VI has been an unincorporated territory of the United States since we bought it from Denmark in 1917, but is generally not a part of the United States for federal tax purposes. See Revised Organic Act of the Virgin Islands, ch. 558,

---

[9] We note this argument but will not discuss it further because we held in Cooper v. Commissioner, T.C. Memo. 2015-72, at *22, that "[s]ection 932(c) does not provide that a taxpayer's subjective belief that he/she is a *bona fide* resident of the Virgin Islands is sufficient to place him/her into that section's single filing regime. More is required." The Eleventh Circuit recently adopted this view in Commissioner v. Estate of Sanders, 834 F.3d 1269 (11th Cir. 2016), rev'g and remanding144 T.C. 63 (2015).

sec. 2, 68 Stat. 497 (codified as amended at 48 U.S.C. sec. 1541(a) (2012)); sec. 7701(a)(9). Congress instead established a "mirror tax system" for the VI. This makes VI taxation very similar to U.S. taxation by replacing "United States" with "Virgin Islands," and *vice versa*, in the VI tax code. See 48 U.S.C. sec. 1397; see also Danbury, Inc. v. Olive, 820 F.2d 618, 620 (3d Cir. 1987).

For most of the twentieth century, taxpayers who earned both U.S.- and VI-source income had to file returns and pay taxes to both jurisdictions, in a way similar to the filing of both federal and state income tax returns. See Appleton, 140 T.C. at 278. This all changed when Congress enacted section 932 of the Code as part of the Tax Reform Act of 1986, Pub. L. No. 99-514, sec. 1274, 100 Stat. at 2596.[10] Section 932 unifies the tax obligation of those individuals--both *bona fide* residents and nonresidents of the VI--with VI-source income. (The rules are different for corporations. This opinion is not for them.) The legislative history refers to this as a "U.S. tax liability." See S. Rept. No. 99-313, at 482 (1986), 1986-3 (Part 3) C.B. 1, 482. "[F]or purposes of determining the tax liability of individuals who are citizens or residents of the United States or the U.S. Virgin

---

[10] Section 932 is not part of the mirror code and is thus not present in the VI territorial tax system. Its purpose is to help ensure a unified tax split between the VI and the U.S. Treasury for those U.S. citizens who have VI-source income. See Appleton v. Commissioner, 140 T.C. 273, 280 n.12 (2013).

Islands, the United States will be treated as including the Virgin Islands (for

purposes of determining U.S. tax liability) and, under the Virgin Islands 'mirror'

Code, the Virgin Islands will be treated as including the United States (for

purposes of determining liability for the Virgin Islands tax)." Id.

For nonresidents of the VI with VI income--the situation that we must

assume that the Coffeys are in for these motions--

> tax liability to the Virgin Islands will be a fraction of the individual's
> U.S. tax liability * * *. Such an individual will file identical returns
> with the United States and the Virgin Islands. The Virgin Islands'
> portion of the individual's tax liability (if paid) will be credited
> against his total U.S. tax liability. Taxes paid to the Virgin Islands by
> the individual, *other than the Virgin Islands portion of his U.S. tax
> liability*, will be treated for U.S. tax purposes in the same manner as
> State and local taxes.

Id. at 483, 1986-3 C.B. (part 3) at 483 (emphasis added).[11]

This concept of a single title 26 liability, split between the IRS and the

VIBIR, is found as well in the text of the Code. Section 932(a)(2) imposes a filing

requirement for VI nonresidents with VI income and says such an individual "shall

file *his income tax return* for the taxable year with both" the IRS and the VIBIR.

Id. (emphasis added). Section 932(b)(1) requires the payment of a portion "of the

---

[11] There is nothing in the briefs on these motions to suggest that the VI has an additional territorial income tax that would be the equivalent of a state income tax. Even if it did, it's not relevant to the outcome of these motions.

taxes imposed by this chapter" to the VI. And section 7654 provides for the division between the federal and territorial governments of "[t]he net collection of taxes imposed by chapter 1." The familiar Form 1040 (or its shorter versions) is how this liability is computed and reported.

It's only the place of filing that familiar return, and the allocation of the "U.S. tax liability" that is so complicated. Section 932 divides that single tax liability between the federal and territorial governments. It does this by distinguishing *bona fide* VI residents from U.S. residents who earned some VI-source income. U.S. residents with VI-source income must still file returns with both the IRS and the VIBIR. Sec. 932(a)(2).[12] A *bona fide* VI resident need file a return only with the VIBIR if he meets the requirements of section 932(c)(4):[13]

- is a *bona fide* VI resident;[14]

---

[12] Individual taxpayers would file Forms 1040 with the IRS, but they would not file Forms 1040 with the VIBIR. Rather, they send the VIBIR a copy of the Form 1040 they send to the IRS together with a Form 8689 (a form used to allocate and calculate income attributable to the VI). See IRS Pub. 570 (2003).

[13] Section 932 tells taxpayers they don't have to file with the IRS in quite a roundabout way--if they meet the requirements of section 932(c)(4), their income is exempt from U.S. taxation. See Appleton, 140 T.C. at 281. With all income exempt, a taxpayer doesn't have a filing obligation in the United States under section 6012.

[14] The current version of section 932(c)(4)(A) says "a bona fide resident of

(continued...)

- reports all income and its sources on the VI tax return; and

- fully pays the tax liability shown on the VI return.

If the taxpayer fails any of these requirements, he falls right back into the normal federal filing regime. See Appleton, 140 T.C. at 281.

Although seemingly providing a benefit, section 932(c)'s rigid requirements are a stumbling block for many because its plain language means a taxpayer has to file a perfect return to get its protections. A taxpayer who forgets he won $50 on a scratch-off ticket he got in the mail technically fails section 932(c)(4)(B) if he doesn't report it. As the Coffeys and others have complained, this rigidity might

---

[14](...continued)
the Virgin Islands during the entire taxable year," but this wasn't always true. In 1954 Congress established the "inhabitant rule" that required filing only with the VIBIR for "permanent" VI residents. The newly enacted section 932 in 1986 stated that the taxpayer had to be a *bona fide* VI resident "at the close of the taxable year." Congress then changed this in October 2004 by striking that language and replacing it with "during the entire taxable year." American Jobs Creation Act of 2004, Pub. L. No. 108-357, sec. 908(c)(2), 118 Stat. at 1656. At the same time, it also added section 937 to Code, which specifically defines *bona fide* residency as presence in the VI for at least 183 days during the year without having a tax home outside the VI or a "closer connection * * * to the United States or a foreign country." Id. sec. 908(a), 118 Stat. at 1655; sec. 937(a)(1) and (2). The years at issue here are 2003 and 2004, and the definition of *bona fide* residency was different for each year. Before the 2004 amendment, we'd look to the factors used in Vento v. Dir. of V.I. Bureau of Internal Revenue, 715 F.3d 455 (3d Cir. 2013) (citing Sochurek v. Commissioner, 300 F.2d 34 (7th Cir. 1962), rev'g and remanding 36 T.C. 131 (1961)), to determine *bona fide* residency. We aren't being asked to do that here because these are the Coffeys' summary-judgment motions and we have to assume that they weren't *bona fide* VI residents.

lead to a serious consequence--an unlimited statute of limitations for the IRS to assess any taxes from years the taxpayer filed only with the VIBIR.[15]  Congress seemingly recognized this problem and directed that the secretary "shall prescribe such regulations as may be necessary to carry out the provisions of * * * sections 931 and 932, * * * prescribing the information which the individuals to whom such sections may apply shall furnish to the Secretary."  Sec. 7654(e).

The Secretary didn't get around to issuing regulations under section 932 by the time the Coffeys had to figure out their filing obligations for 2003 and 2004. The IRS finally did release some guidance in 2007, with Notice 2007-19, 2007-1 C.B. 689.  This notice divided *bona fide* VI residents into two categories:  those who earned $75,000 or more and those who didn't.  If a *bona fide* VI resident earned less than that magic number, his U.S. statute of limitations under section

---

[15] The sharp teeth of this perfect-return rule can be worn down by other quirks of this system.  We assumed in Appleton, for example, that the taxpayers failed at least one part of section 932(c)(4).  Thus it put them back into the federal filing regime.  But the taxpayers in Appleton were *bona fide* VI residents.  Using regulations and other guidance available at the time the taxpayers filed their return, we determined the appropriate place for them to file was with the VIBIR. We therefore held the statute of limitations began to run when they filed their returns with the VIBIR because, even though they didn't get the protections of section 932(c), their filing obligations with the IRS said to file with the VIBIR, which is exactly what they did.  See Appleton, 140 T.C. at 287.  The real threat of an unlimited statute of limitations would have been realized if the IRS had required *bona fide* VI residents who failed section 932(c)(4) to file somewhere in the United States.

6501 would begin to run when he filed a return with the VIBIR. If a *bona fide* VI resident earned $75,000 or more, he had to file with the VIBIR and send a zero return (i.e., return reporting no gross income) to the IRS office in Bensalem, Pennsylvania, with a statement attached explaining his VI residency. Perhaps seeing the arbitrariness of this distinction, the IRS issued Notice 2007-31, 2007-1 C.B. 971, less than two months later. This notice got rid of the income distinction and created a hard rule: If a taxpayer claimed to be a *bona fide* VI resident and filed a return only with the VIBIR, this return would start the section 6501 statute of limitations in the United States. But this was the IRS's position only for tax years ending on or after December 31, 2006. For any years before--including years from before that notice was even issued--the IRS's position was still that of Notice 2007-19 (i.e., if the taxpayer reported $75,000 or more of income, he had to file a zero return with the IRS).

The Secretary finally issued regulations under section 932 in 2008. Sec. 1.932-1, Income Tax Regs.[16] They pretty much mirror the IRS's position in the second 2007 notice:

> For purposes of the U.S. statute of limitations under section 6501(a), an income tax return filed with the Virgin Islands by an individual who takes the position that he or she is a bona fide resident of the Virgin Islands * * * will be deemed to be a U.S. income tax return, provided that the United States and the Virgin Islands have entered into an agreement for the routine exchange of income tax information satisfying the requirements of the Commissioner.

Sec. 1.932-1(c)(2)(ii), Income Tax Regs. Had this regulation been in effect for the years at issue here, the Coffeys would easily have won this case. Although the regulation does not explicitly say how a taxpayer "takes the position" of being a *bona fide* VI resident, the Commissioner admitted at oral argument that "Mrs. Coffey [filed] a return *claiming to be* * * * a bona fide resident of the [VI]." (Emphasis added). But, as it is, the regulation didn't exist in 2003 and 2004, and we're left to find an answer in the caselaw using analogical reasoning in the usual common-law fashion.

----

[16] The Secretary did issue temporary regulations under section 932 in 2005 that applied to tax years ending after October 22, 2004. See sec. 1.932-1T, Temporary Income Tax Regs., 70 Fed. Reg. 18931 (Apr. 11, 2005). These temporary regulations did not address whether taxpayers taking the position that they were *bona fide* VI residents would be deemed to have filed their U.S. tax return for statute-of-limitations purposes.

We'll start by remembering <u>Huff</u>, 135 T.C. 222.  The taxpayer in <u>Huff</u> sent tax returns only to the VIBIR for 2002-04, and the IRS eventually sent him a notice of deficiency for those years in February 2009.  The IRS felt that he wasn't a *bona fide* VI resident during the years in question.  Huff argued that the deficiencies were VI tax matters and we lacked jurisdiction to hear them because 48 U.S.C. section 1612(a) grants exclusive jurisdiction to District Courts to hear VI tax matters.  We held that whether the taxpayer met all the requirements of section 932(c)(4) was a federal-tax matter in which we had jurisdiction.  <u>Id.</u> at 230.

We got great insight into determining if a taxpayer is a *bona fide* VI resident with <u>Vento v. Dir. of V.I. Bureau of Internal Revenue</u>, 715 F.3d 455 (3d Cir. 2013).  In <u>Vento</u>, the taxpayers realized large capital gains in 2001 when they sold their business and they sent returns only to the VIBIR.  Both the VIBIR and the IRS had problems with the taxpayers, so they challenged these two agencies in a district court in the VI.  The court held that the taxpayers weren't VI residents and they quickly appealed.  The Third Circuit looked to an eleven-factor analysis of residency from <u>Sochurek v. Commissioner</u>, 300 F.2d 34 (7th Cir. 1962), <u>rev'g and remanding</u> 36 T.C. 131 (1961), ultimately grouping the eleven factors into four clusters:

- the taxpayer's intent;

- the taxpayer's physical presence;

- the taxpayer's social, family, and professional relationships; and

- the taxpayer's own representations.

Id. at 467-68. After poking into these clusters, the court reversed the District Court's findings as to the Vento parents, and held instead that they were *bona fide* VI residents. Their daughters, on the other hand, were not.

A little over a month after Vento we decided Appleton, 140 T.C. at 273. In Appleton, the IRS agreed that the taxpayer was a *bona fide* VI resident, but it still treated him as a nonfiler because it believed he didn't meet all of the requirements of section 932(c)(4). The taxpayer filed a petition and a summary judgment motion with us, in which he claimed that the Commissioner was barred by the statute of limitations because the taxpayer filed a return with the VIBIR and that's all he was supposed to do. Looking at the facts in the light most favorable to the Commissioner, we held the undisputed facts didn't establish as a matter of law that the taxpayer met all of the requirements of section 932(c)(4). That section therefore didn't provide any filing protection. We nevertheless granted the taxpayer's motion and held that the IRS directed *bona fide* VI residents to file their returns with the VIBIR, regardless of whether they met all the section 932(c)(4)

requirements. Appleton met his filing obligations because he was a *bona fide* VI resident and he sent his returns exactly where the IRS told him to.

The taxpayer in Estate of Sanders, 144 T.C. 63, also claimed to be a *bona fide* VI resident and also sent his returns for 2002-04 only to the VIBIR. We held a trial on the merits and, using the Vento factors, found that the taxpayer was a *bona fide* VI resident. Given this, we held that the taxpayer met his filing obligations. It wasn't necessary to determine if he met the other requirements of section 932(c)(4) because, as we held in Appleton, the IRS directed *bona fide* VI residents to send their returns to the VIBIR.[17]

Finally, we come to Cooper, T.C. Memo. 2015-72. Yet again we had taxpayers who claimed to be *bona fide* VI residents in 2002 and 2003, and who had sent returns only to the VIBIR. The taxpayers moved for summary judgment because they felt the IRS issued the notices of deficiency after the statute of limitations had run. As in Estate of Sanders, the issue was whether the taxpayers were *bona fide* VI residents. They argued that the only thing that mattered was that they had a good-faith belief they were when they sent in their returns. We

---

[17] The Eleventh Circuit vacated our opinion, not on the question of where the taxpayers had to file their returns, but only for us to conduct further factfinding to decide whether the taxpayers were *bona fide* VI residents. See Estate of Sanders, 834 F.3d at 1285.

concluded that under section 932(c)(4), "[m]ore is required." Cooper, at *22.

Although the ultimate issue in Cooper wasn't the same as here, we were quick to

point out that we were "deciding only the issue of petitioners' residency. Even

though the IRS received portions of petitioners' Forms 1040 that were filed with

the VIBIR, we need not and do not herein determine whether those documents are

'returns' filed with the IRS under sec. 6501. Resolution of that issue is reserved

for the future." Id. at *8 n.5.

That future has arrived.

## II. The Parties' Arguments

The Coffeys urge us to focus our attention on an issue that seems to be an

entirely legal question--did the information sent by the VIBIR to the IRS

constitute a filed return? The usual rules for summary judgment apply: We may

grant them summary judgment only if there is no genuine dispute of any material

fact and they are entitled to judgment as a matter of law. See Rule 121(b);

Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965

(7th Cir. 1994). The Commissioner cannot rest on allegations or denials in his

pleadings, but he must present specific facts showing that there is a genuine issue

for trial. See Rule 121(d); Dahlstrom v. Commissioner, 85 T.C. 812, 821 (1985).

The Coffeys, however, still bear the burden of proving there is no genuine dispute

of material fact, and we read factual inferences in a manner most favorable to the Commissioner.  See Dahlstrom, 85 T.C. at 821.

The issue before us is entirely about section 6501(a)--the section that commands the Commissioner to assess a tax if at all within three years from the date the taxpayer files a return.  It defines "return" in the most unhelpful of ways: "[T]he return required to be filed by the taxpayer."  Id.  It also explicitly says there is an unlimited amount of time to assess when the taxpayer fails to file a return. Sec. 6501(c)(3).  In examining section 6501 in Cooper, we said "for a return to commence the running of the period of limitations, the return must be (1) properly filed and (2) the return required to be filed by the taxpayer."  T.C. Memo. 2015-72, at *18.  We will likewise follow that approach today.

The Coffeys' alternative argument, consistently with these standards, lets us assume they weren't *bona fide* VI residents in 2003 and 2004.  They argue nonetheless that the VIBIR accepted their returns as sufficient to start the statute of limitations.  The Commissioner did not, but the Coffeys argue that we should apply the test in Beard v. Commissioner, 82 T.C. 766 (1984), and find that their returns were filed with the IRS.  After all, the right IRS office got at least a portion of their returns and it even selected them for audit based on this information.

The Commissioner laughs at any suggestion that this is a simple case and that the Coffeys filed a return with the IRS. To begin with, he argues that the Coffeys filed only territorial returns, not federal ones. He contended during oral argument that any smart taxpayer would've concurrently filed a zero return with the IRS, as the agency directed years later in Notice 2007-19. He admitted that the IRS had not actually provided this guidance when the Coffeys had to fill out their returns.[18] He also said that even if the Coffeys had sent their entire return to the IRS with an attachment clearly explaining their position that they were VI residents, this wouldn't have been enough because their correct return should've been a zero return. According to the Commissioner, less is more.

Notwithstanding what he believes the Coffeys should've sent, the Commissioner also argues that what the IRS did receive doesn't amount to a filed return. He feels that the two-pages-plus-W-2s simply lacked enough information to be a valid return, and the lack of an original signature also prevents it from being a return. We specifically note that the Commissioner does *not* argue that we have a third-party filing problem; i.e., that the return came from the VIBIR rather

---

[18] Despite the Commissioner's insistence that any reasonable taxpayer would've known to file a protective return, he also insinuated that perhaps only those with tax planners could understand, by saying "I don't expect Mrs. Coffey to get it, but I do expect the tax planner to get it."

than from the Coffeys directly. He has since conceded that "[a] taxpayer's subjective intent has no role to play in determining whether a valid return has been filed."[19] In other words, the Commissioner focuses entirely on the "return" argument and not on the "filed" issue. With this concession, we can treat the Coffeys' filing of their returns as analogous to the situation in Winnett v. Commissioner, 96 T.C. 802, 808 (1991), where the taxpayers sent their return to the wrong IRS service center. When this service center discovered the error, it forwarded the return to the correct one. We held that the return was filed on the date the correct service center received it. As in Winnett, the correct revenue office did eventually receive the documents in question here. The IRS Philadelphia office made clear markings on the Forms 1040 it received, such as stamping its own document ID numbers on them.

Here, the Coffeys intended to file a return under section 932(c) by sending it to the VIBIR. They might have been wrong about where to send it, but they intended to file a return as American citizens. Just as in Winnett, they sent it to the wrong place but at least parts of it ended up in the right place.

_____

[19] The Commissioner does believe, however, that a taxpayer's subjective intent "does have a role to play in determining whether a filed document constitutes a valid return." The Commissioner specifically said that "We're not challenging Exhibits 2-P and 3-P [sic], the returns that she filed with the VIBIR. We're not saying those are not valid returns."

But were the documents that the IRS actually received the Coffeys' "returns"?

III.     What's a Return?

Despite the many complexities of the Code and regulations, we are left without a definition of "return".  And perhaps that's exactly the way it should be.  After all, as the Commissioner himself acknowledged during oral argument, it is the taxpayer and not the return that is audited.  This leaves us with the discretion to make the definition of return fit the context, and to be practical about it.  "The purpose is not alone to get tax information in some form but also to get it with such *uniformity, completeness,* and *arrangement* that the physical task of handling and verifying returns may be readily accomplished."  Commissioner v. Lane-Wells Co., 321 U.S. 219, 223 (1944) (emphasis added).

To determine if the information the IRS received from the VIBIR was a "return", both parties point us to the multifactor test we laid out in Beard, 82 T.C. 766.  Beard has become the go-to case to answer this question, and we'll likewise apply the Beard test today.  But we do note that this case is a shining example of why Beard's definition ought to be applied with some consideration of the context of a particular case.  Beard tells us that, for a document to be a "return" for statute-of-limitations purposes, it must:

- contain "sufficient data to calculate tax liability,"

- "purport to be a return,"

- "be an honest and reasonable attempt to satisfy the requirements of the tax law," and

- be executed under penalties of perjury.

Id. at 777. We'll look at each factor in turn.

### A. Sufficiency of the Data

This is perhaps the main disagreement between the parties. The Coffeys argue that the IRS got enough information from the VIBIR. They also argue that the IRS could've requested any missing information from the VIBIR pursuant to the TIA. The Commissioner believes that the forms the IRS received "do not disclose information in such a way that [the returns] could be readily verified"; there was too much information missing.

We'll break this down into three parts:

- Does it matter that the IRS could have asked VIBIR for the information?

- Is there a distinction between a return that is valid and one that is verifiable? and

- Does it matter to these returns' validity that so many schedules were missing?

## 1.    Asking for the Missing Information

We first discuss the Coffeys' point that the IRS could've asked for any missing information.  This cannot be doubted--the information-sharing agreement says so.  The Coffeys therefore think that Holmes v. Dir. of Dep't of Revenue and Tax'n, Gov't of Guam, 937 F.2d 481 (9th Cir. 1991), is directly on point.  In Holmes, Guam disallowed a deduction on the Guamanian tax return of an individual who owned an S corporation in the Commonwealth of the Northern Mariana Islands (CNMI).  Guam disallowed the deduction more than three years after the individual filed his return.  After first deciding that Guam recognized S corporations in general, see Holmes v. Dir. of Revenue and Tax'n, Gov't of Guam, 827 F.2d 1243 (9th Cir. 1987), the court held that Guam was too late to the challenge.  It reasoned that Guam was certainly on notice of the taxpayer's intent to take the deduction.  It also said:

> As for future cases, no showing has been made that the CNMI Department of Finance refuses to release any information requested by the Guam Department of Revenue; in fact, the two jurisdictions agreed in 1984 to share relevant tax return information.  Thus, absent some unusual circumstance, the Department may obtain informational returns filed by CNMI corporations simply by asking, and will be notified of any potential problems merely by scanning its individual returns for S corporation income or deductions.  If it fails to request such information or neglects to act on the information it does have within the allotted time, without obtaining a waiver, its rights will

expire, *as would the rights of its counterpart on the mainland, the I.R.S.*

Holmes, 937 F.2d at 484-85 (emphasis added).

We think Holmes is helpful, but not directly on point. The threshold question here is whether there was a return at all. In Holmes, Guam received the required return from its taxpayer, and that was never in dispute. The information Guam wanted was going to be helpful in auditing that taxpayer. There's certainly nothing in the opinion to support that that information was something the taxpayer was required to attach to his return. We also think it important to point out that the Ninth Circuit did not say that a document that otherwise would not have been a return became one because Guam could've asked for and received the missing information from another sovereign. We've already held that the IRS is under no obligation to inform taxpayers of defects in their filings that prevent them from being returns, even if the IRS easily could--or even normally does. See, e.g., Doll v. Commissioner, T.C. Memo. 1965-191 (IRS did not inform the taxpayer that he forgot to sign the return), aff'd, 358 F.2d 713 (3d Cir. 1966).

We therefore do not hold that the information-sharing agreement between the VIBIR and the IRS means that we have to pretend that all the information that the VIBIR has is also information that the IRS has. But that's not the end of the

analysis because the IRS actually got a chunk of the return that the Coffeys sent to the VIBIR. We have to ask, then, whether that chunk was itself a "return". And that means asking how incomplete a return can be before it's not a "return" at all.

### 2. Validity v. Verifiability

Remember that the Commissioner said his objection to the Coffeys' assertion that what he actually had in hand was a return was that what he got did "not disclose information in such a way that [the returns] could be readily verified."

But is that a part of the test?

The Code itself suggests that it is not. Section 6611(g) is an obscure provision about interest on taxes, and specifically the interest that the Commissioner owes to taxpayers who overpay their tax. It governs a certain kind of situation where there's been a filed return but it's incomplete. It says that--for the purpose of getting interest on an overpayment--"a return shall not be treated as filed until it is filed in processible form." Sec. 6611(g)(1).

And a return is *processible* if it is filed on a "permitted form" and contains "sufficient required information (whether on the return or on required attachments) to permit the mathematical verification of tax liability shown on the return." Sec.

6611(g)(2)(B)(ii). Verifiability is important here, but it doesn't affect a return's *validity*; it affects a return's *processibility.*

There is no final regulation that addresses this situation, but there is a proposed regulation[20] that sensibly says a return includes the "components" of a return, and then defines components to include the various schedules that taxpayers are instructed to attach to their returns. See sec. 301.6611-1(h)(2), Proposed Proced. & Admin. Regs., 49 Fed. Reg. 39570 (Oct. 9, 1984). But section 6611(g)(2)(B)(ii) also says that missing information affects the processibility of a return only if its absence prevents "the mathematical verification of the tax liability as shown on the return."

This means that a return can be valid even if it does not allow for verification. The caselaw gives us a good example: Deutsche Bank filed its 1999 income tax return on time, but it didn't attach Form 1120F, Form 8805, or Form 1042-S. (These are uncommon forms -- what matters is that there were three of them and none was attached to the return.) The bank had overpaid its tax that year and wanted interest. But the defense of the government was not that the return was not filed, but that it was not complete enough to be mathematically verified.

---

[20] Proposed regulations are entitled to deference under Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), which means we defer to them if they persuade us.

Even then, the Federal Circuit reasoned, "A return without a required attachment may nonetheless be processible when the information contained on that missing attachment is readily available elsewhere in the return or when the information is irrelevant to mathematical verification." Deutsche Bank AG v. United States, 742 F.3d 1378, 1383 (Fed. Cir. 2014).

The Commissioner's own IRM draws the same distinction: "Both a valid return and a processable return must have sufficient data to calculate the tax liability shown on the return, but processability also takes into account the Service's processing tasks . . . . For example, a return will be valid even though it is missing Form W-2 or Schedule D, but it will not be processable because the calculations are not verifiable." IRM pt. 25.6.1.6.16(2) (Oct. 1, 2010). We can thus define three species in the return menagerie;

- valid returns that start the statute of limitations running because they have enough information to calculate a tax liability;

- processible returns that start the statute of limitations and trigger the IRS's obligation to pay interest because they are complete enough to allow mathematical verification, and

- perfect returns with no missing information at all.

What did the IRS have here?

### 3. Effect of the Missing Schedules Here

There are cases to help us apply this taxonomy. It is settled, for example, that a purported return need not be perfect to be a valid return. See Zellerbach Paper Co. v. Helvering, 293 U.S. 172, 180 (1934) ("Perfect accuracy or completeness is not necessary to rescue a return from nullity * * *. This is so though at the time of filing the omissions or inaccuracies are such as to make amendment necessary"). Even a return filled with lies can be a return. The Supreme Court held in Badaracco v. Commissioner, 464 U.S. 386 (1984), that a taxpayer's original and *fraudulent* returns were still "returns". The Court reasoned that the fraudulent returns "purported to be returns, were sworn to as such, and appeared on their faces to constitute endeavors to satisfy the law." Id. at 397. Rather than not including information, fraudulent returns purposefully include wrong information. They are nonetheless returns.

What we have here, though, is not imperfection or fraud, but missing schedules. We and the IRS have overlooked missing schedules in the past. In Blount v. Commissioner, 86 T.C. 383 (1986), we held that even though the taxpayer failed to attach his W-2 to his return (an error he later corrected), the statute of limitations began to run from the date he filed the return. We applied the Beard test and concluded that "[t]he omission of a Form W-2 does not prevent

the calculation of tax liability." Id. at 387.  On another occasion, the IRS expressed its view that an otherwise complete return that was missing its Schedule A was nonetheless sufficient to start the statute of limitations as a "return".  SCA 200010046 (Jan. 12, 2000).  "While a return may lack supporting *schedules* for particular items of gross income, deductions, and credits, it will generally provide sufficient data to calculate a tax liability.  The fact that the tax liability computed on the original return is later determined to be incorrect does not necessarily cause the return to fail the substantial compliance standard."  Id. (emphasis added).[21]

And in McCaskill v. Commissioner, 77 T.C. 689, 698 (1981), there was a missing Schedule C, but though "[w]e agre[ed] with respondent that petitioners have failed to indicate the nature and source of their income * * * we [did] not agree that they thereby failed to file a return."

---

[21] Although chief counsel memoranda (CCMs) are not precedential, they do provide "an expression of agency policy" and can be a helpful interpretative tool. Dover Corp. & Subs. v. Commissioner, 122 T.C. 324, 341 n.11 (2004) (quoting Taxation With Representation Fund v. IRS, 646 F.2d 666, 682 (D.C. Cir. 1981)); see also Tupper v. United States, 134 F.3d 444, 448 (1st Cir. 1998); Container Corp. v. Commissioner, 134 T.C. 122, 133 n.12 (2010) (citing Morganbesser v. United States, 984 F.2d 560, 563 (2d Cir. 1993)).

Of course the document here is missing not just a Schedule A or a Schedule C, but all the schedules that the Coffeys had attached to their returns as filed in the Virgin Islands -- all except their W-2s.

We're left to decide when so little is enough, and we think this is a holding that must reflect the facts of each case. Blount tells us to focus on what is necessary to "[calculate the] tax liability." 86 T.C. at 387. Of particular importance to us was that "the returns as filed contain[ed] sufficient information for respondent to make a computation of petitioners' income tax liability." McCaskill, 77 T.C. at 698. We distinguished such a return from others that "[contained] no information in the blanks provided for the taxpayer's income and deductions." Id. In Morgan v. Commissioner, 807 F.2d 81, 83 (6th Cir. 1986), aff'g T.C. Memo. 1984-384, the Sixth Circuit held, in affirming our opinion that a return that was mostly blank except for claims of the Fifth Amendment privilege was not a valid return, that "[t]o constitute a valid return, Form 1040 must reflect a reasonable disclosure of gross income, deductions, and resulting net taxable income."

The focus in all these cases was on whether the information that the IRS had enabled it to *compute* taxable income--maybe not all the information it needed to compute the *correct* taxable income much less "mathematically verify it"--but

enough, as we said in <u>Beard</u>, that the Commissioner did not have to handle it by special procedures and withdraw it from normal processing channels. <u>Beard</u>, 82 T.C. at 777. What do the undisputed facts here show? They show first of all that the IRS had enough to create a transcript of account--albeit one with zeros on almost all the lines. This is telling because, one should recall, the IRS's answer to the question at oral argument of what the Coffeys should have filed if they weren't sure they were residents was that they should have filed a return with all zeros. At the time the Coffeys actually filed their returns with the VIBIR this wasn't the official word of the IRS--rather at oral argument, IRS counsel stated that the protective zero return was "[his] little baby." But not too long afterward, the IRS did issue Notice 2007-19, 2007-1 C.B. 689, which also said taxpayers in the Coffeys' position should file zero returns.

And what the IRS actually got had *more* information than any zero return. It showed the first two pages of the Coffeys' Forms 1040. The forms the IRS received reported the Coffeys' gross income, deductions, and credits. Even if the IRS was going to deny the EDP credit reflected on page 2, the forms still disclosed "gross income, deductions, and resulting net taxable income." <u>Morgan</u>, 807 F.2d at 83. Missing schedules certainly may draw the eye of the IRS, but they don't prevent the computation of a taxpayer's liability--unlike the forms in <u>Morgan</u>,

where the taxpayer failed to give the basic information needed for the IRS to even calculate a tax liability. In cases like <u>Morgan</u> and <u>Beard</u> the forms weren't returns because the taxpayers altered them and refused to include their basic gross income, deductions, and credits. That is not the case here. The forms sent by the VIBIR reported these income, deduction, and credit figures. And what did the IRS do with these? It created transcripts of account that showed all zeros--*exactly what would have happened if the Coffeys had sent in the zero returns that the IRS now says they should have sent*.

We find that they meet this factor of the <u>Beard</u> test.

B.      <u>What the Documents Purport To Be</u>

The Forms 1040 that the VIBIR sent to the IRS also meet the second factor here. The IRS argues that these forms don't purport to be a return because they were territorial, rather than federal, returns. We are not persuaded. The Forms 1040 that people send to the VIBIR are identical in every respect to the Forms 1040 the IRS wants, made especially apparent with "Department of the Treasury--Internal Revenue Service" visible on the top of page 1. The attachments may be different, and some forms are unique to VI filers, as are some credits. But section 932 makes the filing of VI returns part of one's federal-filing obligation, which means the Code doesn't draw a distinction between "territorial" and "federal"

returns but between territorial and federal filing obligations--not as much what Form 1040 is filed but where.[22]

This point is buttressed by what happens in criminal tax law. A taxpayer who files a fraudulent return with the VIBIR is not charged with violating territorial law. He is instead, like anyone who commits a tax crime on the mainland, charged with filing a fraudulent *federal* return. Here's typical language from an indictment:

> a resident of the Virgin Islands, did willfully cause and aid and assist in, and procure, counsel, and advise the preparation and presentation to the Virgin Islands Bureau of Internal Revenue, of an Individual Income Tax Return, Form 1040, of Rodney E. Miller for the calendar year 2006, which was filed with the Virgin Islands pursuant to the Internal Revenue Code, Title 26 of the United States Code, section 932(c)(4), and was false and fraudulent as to a material matter * * * [i]n violation of Title 26, United States Code, Section 7206(2).

United States v. Miller, Criminal No. 2013-07, Indictment at 1 (D.V.I. Apr. 4, 2013), ECF No. 1; see also United States v. Auffenberg, Criminal No. 2007-0047-

---

[22] One could argue that the Coffeys' federal-filing obligation might, under the assumptions we make at the summary-judgment stage, be discharged only by a return with enough information to compute the tax liability they would owe if in fact they turn out not to be *bona fide* VI residents. Our assumption in favor of the Commissioner on this motion, i.e., that the Coffeys were not *bona fide* VI residents, extends only to their obligation to file with the IRS, not that what was filed has to reflect a return position that they are not *bona fide* VI residents. The purpose of this part of the Beard test is, again, a practical one--did what the IRS receive disclose enough to compute the Coffeys' tax liability? It needn't be enough to compute that liability accurately.

F/B, Second Superseding Indictment at 1-8 (Mar. 18, 2008), ECF No. 295 (charging defendants with conspiracy to defraud the United States under 18 U.S.C. sec. 371 by fraudulently claiming EDC credits in the Virgin Islands).

The IRS wants returns on the forms it prescribes, and it got that form--at least a good part of it--here. There is no question that the IRS was clueless about how to handle what it got--but the undisputed facts show that the IRS was able to stamp it received, summarize its contents in its Individual Master File, and open an audit in due course; it just didn't issue the notices of deficiency before the statute of limitations ran out.

C. Honest and Reasonable Attempt To Satisfy the Requirements

We believe the third factor is also met here. The Commissioner makes an interesting argument why it can't be: He says that if the Coffeys truly believed they did not have any taxable income in the United States, how can a form that reports lots of income, deductions, and credits be their honest attempt to satisfy the requirements of federal tax law? He believes that "[t]he only return [the Coffeys] could file with [the IRS] that is not inconsistent with [their position] would be a protective all zero return." Here the Commissioner bases his argument on the Coffeys' subjective beliefs about their obligations. Let's assume that they truly believed that they didn't need to report anything to the IRS. We don't think their

state of mind is material to whether the information that ended up at the IRS is a "return". We judge the reasonableness of an attempted return by its face. Colsen v. United States (In re Colsen), 446 F.3d 836, 840 (8th Cir. 2006) ("[T]he honesty and genuineness of the filer's attempt to satisfy the tax laws should be determined from the face of the form itself * * *. The filer's subjective intent is irrelevant.") Such a rule makes sense given the Supreme Court's decision in Badaracco. A fraudulent return, which by definition is not an honest attempt to accurately report income and deductions, was still a "return" because it looked like a genuine return. If the Court was concerned about the subjective beliefs of the taxpayer, then the return in Badaracco could not be a return.

The precedents that tell us to look at the face of a purported return to decide if it is a return make sense here. The IRS is a mass-processing organization, and we'd hesitate to resolve any ambiguity in the meaning of "return" that would place any burden on an IRS intake clerk of having to contemplate anything this complicated about the state of mind of an unknown taxpayer. See, e.g., Andre v. Commissioner, 127 T.C. 68, 74 (2006) (noting "the human limits of the IRS in processing as efficiently as possible the correspondence that it receives from a multitude of taxpayers"). The point of this part of the Beard test is to distinguish tax protester returns such as zero returns, see, e.g., Cabirac v. Commissioner, 120

T.C. 163, 169 (2003), aff'd, 94 A.F.T.R.2d (RIA) 2004-5490 (3rd Cir. 2004), and Fifth Amendment returns, see, e.g., Daly v. United States, 393 F.2d 873, 878 (8th Cir. 1968)--returns that on their face show a lack of any honest and reasonable attempt to satisfy the law--from returns that on their face show an attempt to properly report income and deductions.

Looking at what the IRS got here, we see an objective attempt to report income and deductions. The return is nothing like the typical protester returns we've seen but instead includes a breakdown of the Coffeys' income, deductions, exemptions, and credits. The documents include the EDP credit, which doesn't exist in the United States, but even if the Coffeys turn out not to be entitled to it, that makes the item erroneous, not the form itself objectively unreasonable. The Supreme Court tells us a return need not be perfect to start the statute of limitations. Zellerbach, 293 U.S. at 180; see also Sakkis v. Commissioner, T.C. Memo. 2010-256 (finding return valid despite frivolous deduction reducing liability to zero); Steines v. Commissioner, T.C. Memo. 1991-588 (finding a return with a frivolous $100 billion business loss a "return" because it enabled tax computation), aff'd without published opinion, 12 F.3d 1101 (7th Cir. 1993).

We also note the Commissioner's argument contradicts his assertion that the Coffeys would've received the protections of the statute had they filed a zero

return for the purposes of this motion. At oral argument counsel for the Commissioner said that the Coffeys ran the risk of being wrong about being VI residents and that they should have filed protective returns with the Philadelphia office. When we asked him what exactly they were supposed to send to Philadelphia, he said "[W]hatever [they want] to file. We're talking about a protective return." If the Coffeys are indeed not VI residents, it means they are supposed to send a *completed* return to the IRS. Nonetheless, the Commissioner argues that a return with all zeros would be sufficient to start the statute of limitations in such a situation. But if the Coffeys were required to send a return to the IRS that showed a reasonable attempt to reflect their true income and deductions, how could a return with all zeros constitute such an attempt? It seems to us that a form reporting all the Coffeys' income and deductions, even if it included an erroneous credit on its face, is a much more reasonable attempt to satisfy their obligations than one containing all zeros.

D. Documents Executed Under Penalties of Perjury

The fourth factor is a bit complicated. The Code requires a taxpayer to sign his return under penalty of perjury. Secs. 6061, 6065. The parties do not appear to dispute that the Coffeys signed the forms before sending them to the VIBIR. But the Commissioner argues that the forms the IRS received had to have original

signatures (i.e., wet-ink signatures). If that's true, then these documents must not be returns because the VIBIR transmitted them to the IRS electronically, which means the entire return was scanned, including the signatures. The Coffeys argue that the signature requirement falls under Zellerbach's conclusion that a return need not be perfect to start the statute of limitations. They also point out that the IRS routinely accepts nonoriginal signatures.

We agree with the Commissioner that Congress granted the IRS great leeway in prescribing the signature method. See sec. 6061(a) ("any return * * * required to be made under any provision of the internal revenue laws or regulations shall be signed in accordance with forms or regulations prescribed by the Secretary"). The Commissioner tells us it has been his longstanding custom that an original signature is required. See, e.g., Berenbeim v. Commissioner, T.C. Memo. 1992-272 ("It is generally the practice of the Internal Revenue Service Centers, however, not to file a return unless it has an original signature.") He even points us to a sentence in one of our own opinions where we said that "[a] return is valid only if it is verified under penalty of perjury by an original signature and filed in the appropriate office." Turco v. Commissioner, T.C. Memo. 1997-564. Nonetheless, we are unable to find anything in the Code or regulations that

explicitly calls for an "original" signature.[23]  The Code and regulations instead require only that the taxpayer "shall sign" the return.  Sec. 1.6061-1(a), Income Tax Regs.

As the Coffeys point out, the IRS does accept returns without original signatures.  In Rev. Rul. 68-500, 1968-2 C.B. 575, the IRS concluded that it would accept Forms 1041 and Forms 1040NR with facsimile signatures.  This ruling admittedly required that the fiduciary or agent could make such a signature only if he sent the IRS a letter with an original signature that listed all of the returns being signed via facsimile.  Id.  And the ruling required that the facsimile signature be affixed after any photocopying.  Id.  Nonetheless, we find it notable that the ruling said that "[a] reasonable construction of the regulations permits some flexibility with respect to the method of affixing signatures to income tax returns."  Id., 1968-2 C.B. at 576.[24]

---

[23] The Commissioner couldn't find anything either, admitting he too "[doesn't] know the answer."

[24] This is consistent with the Commissioner's position at oral argument. When we asked him if the IRS has the authority to change the Code, he adamantly said "no * * * the Code is the Code."  If the IRS is willing to accept some returns without original signatures and it doesn't have the power to change the Code, then that means the Code doesn't always require an original signature.  Neither the Code nor the regulations define "sign", and despite the Commissioner's belief that an original signature is required, we see no reason to find that "sign" means one

(continued...)

Despite the Commissioner's insistence that he has complete discretion in prescribing the manner of signing, this isn't entirely correct. We have on a number of occasions found a joint return to be valid despite the missing signature of one spouse. See, e.g., Estate of Campbell v. Commissioner, 56 T.C. 1 (1971); Strong v. Commissioner, T.C. Memo. 2001-103. These decisions stand despite the Commissioner's continued insistence that they're wrong because the regulations require both spouses to sign. See sec. 1.6013-1(a)(2), Income Tax Regs.; G.C.M. 38440 (July 11, 1980) (noting that, despite our opinions to the contrary, the IRS "believe[s] the omission of one signature on a submitted joint return should render the return invalid and be treated the same as single unsigned returns").

We've also overlooked a lack of a signature outside the world of joint returns. In Gen. Mfg. Corp. v. Commissioner, 44 T.C. 513 (1965), a parent and a subsidiary filed a consolidated return. The president of the parent corporation signed the return and affixed the parent corporation's seal to it. Id. at 517. The subsidiary never filed its own corporate return, and the IRS eventually sent it a notice of deficiency. Id. at 518. The subsidiary argued that it didn't need to file a

---

[24](...continued)
thing in the Code and another in the regulations. When we asked the Commissioner's counsel why he accepts facsimile signatures under some circumstances, he honestly answered "I don't know."

separate return because the parent filed a consolidated one, and it argued in the alternative that the consolidated return constituted its individual return and the notice of deficiency was sent too late. Id. at 520, 522. The Commissioner argued that the subsidiary corporation didn't sign the consolidated return, thus making it a nullity for income tax purposes. Id. at 523. We disagreed. Although we did find that the consolidated return was invalid, we held that the form did constitute the subsidiary's individual return. Id. at 522. We noted that according to Zellerbach a return need not be perfect, and the return in question was in substantial compliance with the requirements of a return. Id. at 523. The complete lack of the subsidiary's signature (seemingly worse than a copied one) did not prevent the statute of limitations from starting to run. We placed particular emphasis on the fact that the filing gave the IRS enough information about the subsidiary to examine the return, and concluded that the "notice could have been issued prior to" the end of the three-year period. Id. at 524.

Signatures have two important functions in the legal world. They give something legal effect and they provide means of authentication. See 1-1 Arthur Linton Corbin, Corbin on Contracts, sec. 1.12, at 32 (2015); 1-2 Arthur Linton Corbin, Corbin on Contracts, sec. 2.10, at 162 (2015). Signing a tax return gives it legal effect because it's a way of saying that "this is my tax return and I really

mean it." In other words, it distinguishes it from other tax returns one might've filled out but later edited. The signature helps with authentication in case the IRS ever needs to question the taxpayer about the return. Making sure it's really his tax return is a good way to start.

As discussed above, the IRS does at least sometimes allow nonoriginal signatures. In each of these situations, "the Service was careful to require authenticating safeguards to ensure that the alternative signature was reliable." Program Manager Technical Advice (PMTA) 00389 (Aug. 1, 2000). We can see safeguards at work in those cases where we looked past a problem with the signature. In the missing-signature-of-the-spouse cases, the signing spouse is there to assure us the spouse really meant to join the return. In Gen. Mfg., even though the subsidiary didn't sign the return, its parent signed it and even affixed the corporate seal. There are strong safeguards here too. The IRS didn't receive the Forms 1040 from just anyone. It received them from the VIBIR, the official revenue agency of a U.S. possession and one with which the IRS has a longstanding information-sharing agreement. It's undisputed that the VIBIR accepted the Coffeys' forms as valid returns.

We do not hold today that photocopied or scanned signatures are always sufficient to make a return valid. Rather, based on Zellerbach's idea that a return

doesn't have to be perfect and the strong authenticating safeguards in place in this case, we are satisfied the Coffeys' scanned signatures were sufficient to meet this factor of the <u>Beard</u> test.[25] "The error, if any, in filing a photocopy which has not been actually, physically, and manually signed * * * is one which is minor and not seriously misleading." <u>Sommers v. IBM</u> (<u>In re Legal Cooperatives, Inc.</u>), 5 B.R. 382, 386 (Bankr. S.D. Tex. 1980), <u>rev'd on other grounds</u>, 640 F.2d 686 (5th Cir. 1981).

## Conclusion

We are certainly cognizant of the concerns of both parties here. The Coffeys and the VI argue that a finding against them gives the IRS an eternally open statute of limitations to assess taxes against anyone it doesn't believe is a *bona fide* VI resident. And they are quick to point out that the IRS adopted their approach starting with the tax years ending on or after December 31, 2006, in section 1.932-1 of the regulations. Most troubling perhaps is that Congress

---

[25] We don't believe this holding contradicts <u>Turco</u>. Although we did use the phrase "original signature," our holding in <u>Turco</u> is distinguishable from this case and <u>Gen. Mfg.</u> because the taxpayer in <u>Turco</u> gave the photocopy to an IRS agent. We concluded that the taxpayer failed to file his return because the IRS agent isn't the designated place for filing. As we concluded above, the forms in question here did find their way to the designated filing place. <u>Turco</u> certainly didn't mean to overrule <u>Gen. Mfg.</u>, a case where the return didn't have the taxpayer's signature at all, and we do not believe it meant to say all tax returns have to have original signatures without fail. This would be too expansive a reading.

commanded the Secretary to issue regulations under section 932 and he simply failed to do so by the time the Coffeys had to fill out their returns. See sec. 7654(e) ("The Secretary shall prescribe such regulations as may be necessary to carry out the provisions of * * * sections 931 and 932.").

Although these concerns are valid, they're not as devastating as they might seem to be. A finding against the Coffeys would not give the IRS an unlimited statute of limitations. It's true that taxpayers might be hauled into court long after three years had passed, but they'd be fighting over whether they're *bona fide* VI residents. This would not be a dispute on the merits of their tax liability. See Cooper, T.C. Memo. 2015-72, at *23. And the absence of regulations doesn't repeal section 932. The Code says that a taxpayer who "is" a *bona fide* VI resident need file only with the VIBIR. Both the Eleventh Circuit and we have already found this to be unambiguous. See Estate of Sanders, 834 F.3d 1269; Cooper, T.C. Memo. 2015-72, at *22.

The Coffeys, and particularly the VI, also stress that finding for the Commissioner creates an opportunity for double taxation. If the IRS can send notices of deficiency to people like the Coffeys long after three years have passed, they run the risk of having to pay tax to the United States and not being able to get a refund from the VIBIR. The VI has its own statute of limitations for filing for

refunds and this period will have come and gone long before the taxpayers get their notice of deficiency from the IRS. We accept this risk as real, and the Commissioner similarly accepted it during oral argument.[26] But the existence for potential double taxation is not determinative, even if some inequities exist. See, e.g., Vento v. Commissioner, 147 T.C. 198 (2016) (taxpayers not eligible for credit of tax paid to VIBIR in computing tax owed to IRS); McGrogan v. Commissioner, No. 2009-167, 2011 WL 3472336, at *7 (D.V.I. 2011) (unreported) (finding no mitigation of potential double tax for a taxpayer with uncertain VI residency). Despite cases like these, we also note that the Third Circuit has observed that the competent authorities[27] of the United States and the VI are supposed to provide a remedy for this problem. Cooper v. Commissioner, 718 F.3d 216, 223 (3d Cir. 2013).

---

[26] The IRS understood this risk when it published Rev. Proc. 2006-23, 2006-1 C.B. 906, where it recommended that those claiming to be VI residents file protective refund claims with the VIBIR to ensure they were timely.

[27] Income-tax treaties generally include a "competent authority" clause which enables a taxpayer to appeal to the competent authorities of the two participating sovereigns if his particular situation is not covered by the treaty and will result in inequitable taxation. It's an administrative procedure conducted by the two sovereigns, with the "competent authority" being some sort of governmental body. See, e.g., Filler v. Commissioner, 74 T.C. 406, 408-09 (1980).

But those competent authorities are not available here, contrary to the Commissioner's assertions during oral argument. The IRS sent the Coffeys a letter in February 2009 that advised them that they had to settle their case in order to obtain relief from double taxation. The letter considered their case to be one of an "improperly claimed" EDP credit, and pursuant to an agreement the United States had with the VI, settling their case and naming the adviser that promoted their plan would be the only way they could secure relief from double taxation; otherwise they would "not be eligible for general competent authority relief."

The Commissioner believes we should construe any ambiguities in the law in his favor because of the sheer potential for abuse. The IRS announced its skepticism of people's claims of VI residence in Notice 2007-19, supra. We acknowledge these concerns, but we also understand the importance of the statute of limitations and the ability of taxpayers to plan their affairs. As we noted throughout this opinion, the Commissioner's assertion that the Coffeys should've known to send in protective zero returns is very farfetched. Not only did the IRS not tell taxpayers this,[28] but it is bizarre to believe a zero return would start the running of the statute of limitations here when the same two pages of Form 1040

---

[28] The Commissioner's counsel at oral argument told us that the IRS simply "[d]idn't do it." Remember also that IRS counsel said that the protective zero return was "[his] little baby."

with significantly more information would not (with one notable difference being that the zero return would presumably contain an original signature).[29] To sum it up, the IRS failed to promulgate mandatory regulations under section 932, failed to tell taxpayers that they should file protective zero returns, and failed to send the Coffeys a notice of deficiency within three years of receiving the cover-over documents. And, only a few short years later, the IRS finally did promulgate regulations that adopt precisely the position that the Coffeys took about how to start the statute of limitations. Despite all this, the Commissioner tells us that the Coffeys lose--though one is left to wonder how the current regulation is valid if the Commissioner is correct that filing anything other than a zero return with the IRS would be inadequate under the Code.

Our conclusion today might seem strange at first--the Coffeys sent their return to the VIBIR, but because the first two pages of it somehow (and without their knowledge or explicit approval) ended up at the Philadelphia office of the IRS, we hold they're protected by the statute of limitations. But as we said in Appleton, 140 T.C. at 292 n.23 (citing Holmes, 937 F.2d at 481), "[i]t is not

---

[29] Taking it to an even further extreme, the Commissioner actually told us that even the Coffeys' complete return (i.e., including all the attachments) would've been worse than a zero return because such a return would've been incompatible with their belief that they were *bona fide* VI residents.

unprecedented for a court to determine that a return filed in one tax jurisdiction may commence the period of limitations in a second tax jurisdiction." We stress that this is not an opinion on the merits of the Coffeys' claims of VI residency: It concerns only the time limit the IRS has to challenge their claims. The IRS received the Coffeys' returns. The Coffeys might not have sent the forms themselves, but we have not found any authority to say they had to. It's the IRS's receipt that matters. The returns were not without their flaws, such as missing schedules and scanned signatures, but it's long been settled that returns don't need to be perfect. We hold the forms the IRS received contained enough information and complied with the IRS's form to a sufficient degree that they constituted returns for the purposes of section 6501.

Appropriate orders will be issued.

Reviewed by the Court.

FOLEY, VASQUEZ, GUSTAFSON, and BUCH, JJ., agree with this opinion of the Court.

THORNTON, <u>J</u>., concurring in the result only: I agree with the result the opinion of the Court reaches but write separately to explain why I would reach that result on a narrower basis, focusing on the text of sections 932 and 6501(a). More specifically, I think that considering the particular facts presented in this case, the returns James Coffey and Judith Coffey (Coffeys, <u>see</u> op. Ct. note 2) filed with the Virgin Islands Bureau of Internal Revenue (VIBIR) under section 932(c)(2) sufficed to commence the limitations period under section 6501(a) for Federal income tax purposes.

Section 932(c)(2) provides that a bona fide resident of the Virgin Islands "shall file an income tax return for the taxable year with the Virgin Islands." Respondent has not disputed that the returns the Coffeys filed with the VIBIR qualify as returns under the four-part test laid out in <u>Beard v. Commissioner</u>, 82 T.C. 766, 777 (1984), <u>aff'd</u>, 793 F.2d 139 (6th Cir. 1986), with respect to the Coffeys' Virgin Islands filing requirement. Respondent claims, however, that the Coffeys were not bona fide residents of the Virgin Islands and that therefore their filings with the VIBIR did not commence the limitations period for Federal income tax purposes under section 6501(a).

The opinion of the Court focuses not on the returns the Coffeys filed with the VIBIR but on copies of those returns which the VIBIR eventually sent to the

Internal Revenue Service (IRS).  Assuming for the purposes of summary judgment that the Coffeys were not bona fide residents, the opinion of the Court concludes that under the <u>Beard</u> test these copies were returns, sufficient to begin the Federal limitations period.

While I agree with the ultimate result the opinion of the Court reaches, I think that it is unnecessary to decide whether the Coffeys were bona fide residents of the Virgin Islands, as respondent asks us to do, or to decide whether the documents the VIBIR sent to the IRS meet the <u>Beard</u> test, because the returns the Coffeys filed with the VIBIR under section 932(c)(2) started the section 6501(a) period of limitations for Federal income tax purposes.

The section 6501(a) limitations period is meant to provide repose to taxpayers who file honest and genuine--though possibly erroneous--returns.  Long ago, in <u>Mabel Elevator Co. v. Commissioner</u>, 2 B.T.A. 517, 519 (1925), the Board of Tax Appeals held that a return which the taxpayer erroneously filed on a fiscal year basis instead of the requisite calendar year basis nevertheless triggered the limitations protection:

> It is urged that since the return filed by the taxpayer was made upon a fiscal year basis, while the law required a return upon a calendar year basis, the return filed was not the return required by the law and could not operate to start running the statutory period of limitations.  With this we can not agree.  The return filed purported to be made in

accordance with the law; it purported to and did include the income of the taxpayer for the period in question. In the absence of any evidence or claim that such return was false or fraudulent with intent to evade tax, it became the duty of the Commissioner to determine, within the time provided by law, whether or not such return was erroneous in any respect.

There can be no doubt that such limitations are placed on assessments for the purpose of assuring the taxpayer, who has made an honest return, that after such period his tax liability will not be reopened; otherwise the business of the country would always have before it the threat of additional taxes against the income of years long past whenever a new theory for interpreting the tax law or for the application of accounting principles occurred to the taxing authorities. If the limitation can be avoided on the plea that the return filed was not such a return as is required by law, although filed in good faith, there is no such assurance for the taxpayer and the limitation becomes of doubtful value at least.[1]

Similar considerations pertain in this case. If a taxpayer's Virgin Islands filing were insufficient to start the limitations period unless the taxpayer was

---

[1]In Paso Robles Mercantile Co. v. Commissioner, 12 B.T.A. 750, 753 (1928), aff'd, 33 F.2d 653 (9th Cir. 1929), the Board of Tax Appeals provided further guidance:

In our opinion the statute of limitations does not begin to run until a return or returns have been filed which at least purport to cover or include the period involved. Where there are two returns which must be considered, each of which includes a part of the taxable year, the period of limitation must be considered as to both and the statute does not run until it expires as to both these returns.

See also Atlas Oil & Ref. v. Commissioner, 22 T.C. 552, 556-557 (1954) (citing Mabel Elevator and Paso Robles with approval).

actually a bona fide resident of the Virgin Islands at the relevant time, then the repose offered by the limitations period would be of doubtful value: Even bona fide residents who filed correct returns would never be free from the threat of a possible IRS challenge and future litigation with respect to their residency status.

In this case, as is generally true of tax cases involving the operation of the statute of limitations, the relevant question is not whether the positions the taxpayers took on their returns were substantively correct, but whether the returns "evince[d] an honest and genuine endeavor to satisfy the law." Zellerbach Paper Co. v. Helvering, 293 U.S. 172, 180 (1934).

A recent case illustrates the application of this principle. In New Capital Fire, Inc. v. Commissioner, T.C. Memo. 2017-177, New Capital Fire, Inc. (New Capital), filed a return for 2002 on which it claimed to be the continuation of the Capital Fire Insurance Co. (Old Capital) and disclosed that Old Capital had been merged into New Capital during 2002 (in what New Capital claimed was an F reorganization). New Capital and Old Capital took the position that they were the same corporation for Federal income tax purposes and that therefore New Capital's filing, which reported both Old Capital's and New Capital's tax items for that year, sufficed to commence the period of limitations for both. The IRS disagreed, claiming that the F reorganization was invalid and that therefore New

Capital and Old Capital were separate taxpayers, with separate filing requirements. On that basis, the IRS concluded that Old Capital had never filed for its last partial year and that therefore the period of limitations had not commenced.

This Court held that the Commissioner's determination was time barred because the period of limitations began for Old Capital when New Capital filed its return (i.e., regardless of whether the F reorganization was valid). Citing Mabel Elevator, the Court (1) noted that the Commissioner had "not alleged * * * that New Capital's 2002 return was false or fraudulent with intent to evade tax" and (2) stated that "[i]t was * * * [the Commissioner's] duty to determine, within the period of limitations provided by section 6501(a), whether New Capital's 2002 return, as it pertain[ed] to Old Capital, was erroneous in any respect." New Capital Fire, Inc. v. Commissioner, at *8-*9.

Somewhat similarly, in Germantown Tr. Co. v. Commissioner, 309 U.S. 304 (1940), a trust company filed a fiduciary tax return instead of a corporate tax return, i.e., the company took the position that it was not a taxable entity and filed according to that position. The Commissioner determined that the company was subject to tax as a corporation and argued that a then-applicable two-year period of limitations had not commenced because no corporate return had been filed. The Supreme Court held that the fiduciary return was sufficient to begin the period of

limitations for the <u>corporate</u> tax liability, although the return failed to compute a tax and although it was reported on the incorrect form.

As the opinion of the Court finds, the Coffeys' returns represented honest and reasonable attempts to file correctly. <u>See</u> op. Ct. pp. 45-48. Like the taxpayers in <u>Mabel Elevator</u>, <u>New Capital Fire</u>, and <u>Germantown Trust</u>, the Coffeys filed returns that were appropriate for reporting the positions taken on those returns. In this case, as in these earlier cases, the Commissioner seeks to defeat the statute of limitations by claiming, essentially, that reasonable and honest positions as to the taxpayers' filing status, which were clearly and adequately disclosed on their returns, are somehow not covered by the statute of limitations. Respondent's argument fails in this case for essentially the same reasons it failed in <u>Mabel Elevator</u>, <u>New Capital Fire</u>, and <u>Germantown Trust</u>.

Respondent suggests that the Coffeys should have filed a second, protective return with the IRS for the purpose of commencing the running of the section 6501(a) limitations period. But respondent's position is difficult to reconcile with the established caselaw under which, as just discussed, the period of limitations was held to have begun even without a protective return. And in any event respondent's position does not explain how a taxpayer is to surmount various practical difficulties alternate filings would present.

For example, in suggesting that the Coffeys should have filed protective zero returns with the Philadelphia, Pennsylvania, IRS Service Center, respondent references on brief page 8 of Publication 570, Tax Guide for Individuals With Income From U.S. Possessions (For use in preparing 2004 returns), claiming that it provided guidance. But Publication 570 says absolutely nothing about filing a protective zero return, nor does it explain where a taxpayer should file such a protective return in the event the taxpayer believes him or herself to be a bona fide resident. Rather, Publication 570 explains only what a taxpayer should do if he or she definitely is (or is not) a bona fide resident. As we noted in Appleton v. Commissioner, 140 T.C. 273, 288-289 (2013) (a case very similar to the present one): (1) there was no guidance at the time which would have directed taxpayers to file a second protective return; (2) in any event, we have traditionally considered a zero return to be a frivolous return, see, e.g., Hill v. Commissioner, T.C. Memo. 2014-134 (finding that a zero return was frivolous and holding that a frivolous return does not commence the section 6501(a) period of limitations); and (3) "to expect a taxpayer to file a protective zero return with a service center to which the taxpayer was not directed, and where IRS employees were not alerted to expect such returns, is unreasonable."

In different ways <u>Mabel Elevator</u>, <u>New Capital Fire</u>, and <u>Germantown Trust</u> all recognize that it would be unreasonable to require a taxpayer to file one or more additional returns staking out phantom positions the taxpayer does not believe are correct, at least in situations where a return that was actually filed discloses enough information for the IRS to flag the relevant issues. While taxpayers must report enough information for the IRS to flag issues and compute the proper amount of tax (which, by the way, a protective zero return would not do), for purposes of section 6501(a) we do not generally require perfection. <u>See</u> <u>Zellerbach Paper Co. v. Helvering</u>, 293 U.S. at 180 ("Perfect accuracy or completeness is not necessary to rescue a return from nullity[.]"). In this case, the Coffeys made an honest and reasonable effort to comply with their filing obligations and provided enough information on the return they filed with the VIBIR to allow proper computation of tax. That should be enough.[2]

---

[2]This conclusion is consistent with the current regulations, sec. 1.932-1(c)(2)(ii), Income Tax Regs., which provide:

> For purposes of the U.S. statute of limitations under section 6501(a), an income tax return filed with the Virgin Islands by an individual who takes the position that he or she is a bona fide resident of the Virgin Islands * * * will be deemed to be a U.S. income tax return, provided that the United States and the Virgin Islands have entered into an agreement for the routine exchange of income tax information satisfying the requirements of the Commissioner.

(continued...)

Respondent objects that the returns the Coffeys filed with the VIBIR did not clearly disclose their residency position to the IRS. In fact, the IRS was eventually informed of the Coffeys' position. Copies of the Coffeys' Virgin Islands returns were forwarded to the IRS (and as explained, see op. Ct. p. 7, the forms used for the Virgin Islands filing were Forms 1040, U.S. Individual Tax Return, repurposed for use as the Virgin Islands return without any changes). But whether the IRS happens to have been informed in this specific context is not controlling. Under the plain statutory text, section 6501(a) applies where a return has been filed, and section 932(c)(2) directs the taxpayer to file a "return" with the Virgin Islands under certain circumstances--it does not say that such a return will not commence the period of limitations unless the IRS gets the message, or unless the return is

---

[2](...continued)
Although these regulations were not in effect for the Coffeys' tax years, we note that they align with the position of this concurring opinion except that they condition the limitations protection on the existence of an information-sharing agreement between the IRS and the VIBIR. While we have no occasion to question the validity of these regulations, we see no reason to think that this requirement for an information-sharing agreement should preclude limitations protection in appropriate cases for periods before the regulations were effective. Indeed, interim guidance which preceded the final regulations was not similarly conditioned on the existence of an information-sharing agreement. See Notice 2007-19, 2007-1 C.B. 689.

correct with respect to the taxpayer's residency status. The return, and not the correctness of the return, is the focus of section 6501(a).[3]

Respondent also contends that no filing with the Virgin Islands can start the period of limitations for Federal income tax purposes because the United States and the Virgin Islands are separate taxing jurisdictions. As the Supreme Court recently stated, however: "U.S. territories * * * are not sovereigns distinct from the United States." Puerto Rico v. Sanchez Valle, 579 U.S. __, __, 136 S. Ct. 1863, 1866 (2016) (holding that the United States and Puerto Rico are not separate sovereigns for double jeopardy purposes). And in any event, we are not today considering the effect of a law passed by the Virgin Islands under the authority delegated to the Virgin Islands by Congress; we are dealing with section 932, which is part of the Internal Revenue Code and which labels a return filed with the Virgin Islands a "return". The authority for treating a filing with the Virgin Islands as a return therefore flows from the Internal Revenue Code and not from any powers delegated to the Virgin Islands territorial government.

---

[3]Respondent similarly argues that a return cannot commence the Federal period of limitations unless the return is filed with the IRS. But again, sec. 932(c)(2) does not require that the return referred to in that section be filed with the IRS--it requires that the return be filed with the Virgin Islands.

For these reasons respondent's argument fails, and I concur with the result, if not the reasoning, of the opinion of the Court.

GALE, GOEKE, PARIS, KERRIGAN, PUGH, and ASHFORD, <u>JJ</u>., agree with this concurring opinion.

GUSTAFSON, J., agrees with this concurring opinion, except as to the word "only" in the first line of the concurring opinion and the phrase "if not the reasoning" in the last sentence of the concurring opinion.

MARVEL, <u>CJ</u>., dissenting:  The opinion of the Court concludes that the transmittal by the Virgin Islands Bureau of Internal Revenue (VIBIR) to the Internal Revenue Service (IRS) pursuant to a Tax Implementation Agreement of part of a Form 1040 filed by James Coffey and Judith Coffey (petitioners) only with the VIBIR constitutes a return filing for purposes of section 6501(a).  Because neither petitioners nor anyone authorized by petitioners to act on their behalf filed or intended to file a Form 1040 with the IRS, the period of limitations on assessment under section 6501(a) did not begin to run.  I respectfully dissent.

Section 6501(a) provides for a three-year period of limitations on assessment after a return is filed.  In determining whether the section 6501(a) period of limitations has begun to run, we examine (1) whether the document the taxpayer submitted was a return and (2) whether the taxpayer properly filed it. <u>Appleton v. Commissioner</u>, 140 T.C. 273, 284 (2013).

Section 6012 generally provides that every individual having for the taxable year gross income which exceeds the exemption amount must file a return. Section 6501 defines a return as "the return required to be <u>filed by the taxpayer</u>". (Emphasis added.)  Because section 6501 defines a return as the return "filed by the taxpayer", a document purporting to be a return that satisfies the requirements of section 6012 must be filed by the taxpayer or by someone legally authorized to

file the return on the taxpayer's behalf and the taxpayer or his designee must intend to file it. <u>Florsheim Bros. Drygoods Co. v. United States</u>, 280 U.S. 453, 462 (1930); <u>see</u> <u>also</u> <u>Allnutt v. Commissioner</u>, T.C. Memo. 2002-311, slip op. at 13 ("A taxpayer may not, by his or her ambiguous conduct, even if unintentional, secure the benefit of the limitations period."), <u>aff'd</u>, 523 F.3d 406 (4th Cir. 2008).

In this case, petitioners filed a Virgin Islands (VI) return with the VIBIR, and the VIBIR then transmitted a portion of the VI return (the first two pages and copies of Forms W-2, which were attached to the VI return) to the IRS to facilitate the transfer to the VIBIR of moneys collected from petitioners. The opinion of the Court does not analyze whether the VIBIR was authorized by petitioners to act as their agent for purposes of filing a Federal income tax return, nor does it identify any evidence in the record to support a finding that the VIBIR was so authorized. In fact, the record contains no evidence that the VIBIR was authorized to act as petitioners' agent; and it appears that petitioners were not even aware that any portion of the VI return they filed would be transmitted to the IRS.[1] See <u>Huff v. Commissioner</u>, 135 T.C. 222, 230 (2010) (stating that taxpayers who were not

---

[1]For a Federal income tax return to be considered properly filed, a taxpayer or someone authorized to act for the taxpayer must comply with any applicable filing requirements. See <u>Dingman v. Commissioner</u>, T.C. Memo. 2011-116, slip op. at 30-31.

bona fide residents of the VI were "required to file a Federal income tax return even if * * * [they] filed a Virgin Islands tax return").

Absent evidence proving that petitioners authorized the VIBIR to file the Form 1040 with the IRS on their behalf, there is no factual basis for concluding that petitioners filed a Federal income tax return sufficient to begin the running of the period of limitations on assessment. Petitioners simply did not file a Federal income tax return, on the facts of this case.

The opinion of the Court addresses whether a taxpayer's subjective intent is relevant when considering whether a valid return has been "filed". It asserts that respondent conceded this issue but acknowledges that a taxpayer's subjective intent "does have a role to play in determining whether a filed document constitutes a valid return." See op. Ct. note 19. The obligation to file a return imposed by section 6012 is that of the taxpayer, and the preparation and filing of a Federal income tax return must be a purposeful act. Our caselaw supports a conclusion that it is the taxpayer or someone authorized to act on the taxpayer's behalf who must file the return and, in so doing, must necessarily intend to file it as the taxpayer's return. See, e.g., Espinoza v. Commissioner, 78 T.C. 412, 422 (1982) ("His failure to pay the additional taxes raises a question as to whether he intended for the amended returns to be filed."); Dingman v. Commissioner, T.C.

Memo. 2011-116, slip op. at 31 ("The record supports a conclusion that petitioner clearly intended to file the returns when his counsel submitted them to the CID."); Allnut v. Commissioner, slip op. at 20 ("[F]iling of a return is established by facts showing proper delivery or mailing of a return with the intent to file it as a return."); Friedmann v. Commissioner, T.C. Memo. 2001-207, slip op. at 19 ("[T]here is nothing in the record to show that petitioner intended his delivery of those documents to the agent in April 1992 to constitute the filing of his returns.").

The opinion of the Court avoids a head-on collision with cases like those cited above by relying on a supposed concession by respondent. It is wholly unclear that respondent has made any such concession; respondent explicitly argues that a taxpayer's subjective intent "does have a role to play in determining whether a filed document constitutes a valid return." See op. Ct. note 19.

Even assuming that the opinion of the Court has accurately understood respondent's position regarding a taxpayer's intent to file a return, we are bound to apply section 6501(a) as written and as interpreted by our caselaw. Section 6501(a) requires the filing of a return by the taxpayer, and the taxpayer must intend the document he files to be a return.

Moreover, in Beard v. Commissioner, 82 T.C. 766 (1984), aff'd, 793 F.2d 139 (6th Cir. 1986), in which we set forth factors for determining whether a

document qualified as a Federal income tax return, we held that a document must be an honest and reasonable attempt to satisfy the requirements of Federal tax law. It is very hard to reconcile the assumption made by the opinion of the Court--that petitioners were <u>not</u> bona fide VI residents--with a finding that petitioners in filing their VI returns honestly and reasonably intended to file U.S. Federal income tax returns. Petitioners did not reasonably intend to file <u>any</u> Federal income tax return with the IRS. Contending that they were bona fide residents of the VI, they intended to file only VI territorial returns and only the VI territorial returns were executed under penalties of perjury, another <u>Beard</u> requirement. <u>Id.</u> at 777. What the VIBIR transmitted to the IRS were copies of parts of the VI returns filed by petitioners. The signatures on those copies were not original signatures (or their electronic equivalent), and they did not attest to the accuracy of the returns for purposes of U.S. tax law.[2]

The mirror system that the opinion of the Court addresses and the lack of regulatory guidance during the years at issue complicate the analysis and give some cover for the conclusions that the opinion of the Court reaches. I am

---

[2]A portion of a return with no original signature cannot be a "return" for U.S. income tax purposes, and it therefore seems impossible for the IRS to prosecute a tax crime or assert a civil fraud penalty on the basis of the transmission of such a document.

concerned, however, that the opinion of the Court opens a door regarding what constitutes a valid return filed by the taxpayer that should not be opened.  Filing a valid Federal income tax return with the IRS for purposes of section 6501(a) requires an intentional act by the taxpayer, and there was none here.

MORRISON, LAUBER, and NEGA, JJ., agree with this dissent.